## In re ENTERGY CORPORATION, et al.

### No. 03–0024.

Supreme Court of Texas.

Argued Nov. 12, 2003.

Decided June 25, 2004.

---

Howard V. Fisher, Hunton & Williams, Dallas, Steven D. Arnold, Hensley, Shanor & Martin, L.L.P., Austin, John R. Hulme, for amicus curiae.

Lawrence L. Germer, Kelli Lynn Smith, Germer Gertz, L.L.P., Beaumont, Mark Held, Clark Thomas Winters, Austin, Paul A. Scheurich, Benckenstein Norvell & Nathan LLP, L. Richard Westerburg, Beaumont, John F. Williams, for relator.

Lindol Bruce Gregory, Daniel Joseph Lawton, Austin, H.P. Wright, for respondent.

Justice SMITH delivered the opinion of the Court.

This dispute arises from a private settlement agreement incorporated in a Public Utility Commission order. After the underlying lawsuit was filed, the trial court denied Entergy Corporation's [1] Motion to Transfer Venue, Motion to Dismiss for Want of Subject Matter Jurisdiction, and

---

1. The defendants in the underlying lawsuit and the relators in this original proceeding are Entergy Corporation and its subsidiary Entergy Gulf States, Inc. Unless otherwise indicated, our references to "Entergy" encompass both Entergy Corporation and Entergy Gulf States, Inc. The plaintiffs below and the real parties in interest in this proceeding are Dale Shearer; Schooner Restaurants, Inc.; Megas Enterprises, Inc.; Texas Cattle Baron Steak House, Inc.; and Michael G. Pearson. We refer to them collectively as "Shearer." Shearer requested class certification in the underlying lawsuit; however, no class certification order has been entered.

Motion to Abate. Entergy, having failed to secure relief from the court of appeals, now seeks a writ of mandamus from this Court on the basis that the Public Utility Commission has exclusive jurisdiction over the subject matter of this dispute. Because we agree, we conditionally grant the writ.

## I. Background

In 1992, Entergy agreed to purchase Gulf States Utilities Company ("GSU"), an electric utility serving customers in eastern Texas and western Louisiana. In order to obtain the requisite regulatory approval for the transaction, Entergy and GSU filed an administrative proceeding, styled Docket No. 11292, with the Public Utility Commission of Texas ("PUC"). In 1993, Entergy, GSU, and various other parties[2] reached an agreement (the "Merger Agreement") which they filed with the PUC as a proposal for resolving Docket No. 11292. The Merger Agreement called for certain anticipated merger-related savings to be shared between ratepayers and shareholders. Nonfuel-related cost savings for the first eight years after the merger were to be divided equally between ratepayers and shareholders. After eight years, all savings were to be passed on to the ratepayers. The Merger Agreement stated that savings were to be reflected in the new entity's rates and would be implemented in three post-merger rate proceedings during the eight-year term of the agreement pursuant to either section 42 or 43 of the Public Utility Regulatory Act.[3]

The PUC adopted the Merger Agreement in its order approving the Entergy/GSU merger application. The order stated that "[a]pplicants [Entergy and GSU] SHALL comply with the terms and conditions set forth in the [Merger Agreement]" and that "GSU SHALL file PURA § 43 rate cases on the schedules and for the purposes established in [the Merger Agreement]." Entergy and GSU then completed the merger, resulting in a new entity known as Entergy Gulf States, Inc. ("EGSI"). Entergy Corporation is EGSI's sole shareholder.

EGSI filed and completed the first two rate cases contemplated by the Merger Agreement. While the second rate case was pending before the PUC, the Legislature passed Senate Bill 7, mandating retail electric deregulation in Texas. Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543 (codified as Public Utility Regulatory Act (PURA), Tex. Util.Code §§ 39.001–41.104 (1998)). Senate Bill 7 dramatically altered the electric utility landscape in Texas by requiring the unbundling of generation, transmission, and distribution services. PURA § 39.051. Senate Bill 7 also froze electric utility rates through December 31, 2001 and called for retail competition to begin January 1, 2002. PURA § 39.052(a).

The passage of Senate Bill 7 raised the question of whether EGSI would be required to proceed with the third rate case contemplated by the Merger Agreement,

---

2. In addition to Entergy and GSU, the signatories to the agreement were the General Counsel of the PUC, the International Brotherhood of Electrical Workers Local 2286, and Texas Industrial Energy Consumers. The Office of the Public Utility Counsel was not a signatory but did sign a document stating that it was not opposed to a PUC order consistent with the agreement.

3. Section 42, which governed rate changes proposed by the PUC, is now codified at Tex. Util.Code §§ 36.151–156. Section 43, which governed rate changes proposed by a utility, is now codified at Tex. Util.Code §§ 36.101–111.

which was scheduled to be filed in November 2001. The PUC addressed the question in Docket No. 22356, an EGSI Senate Bill 7 implementation proceeding. A June, 2000 PUC preliminary order stated:

> The Commission concludes that PURA § 39.201 is quite specific and does not contemplate an additional filing in 2001. Section 39.201(a) requires a utility to file its proposed rates for the transmission and distribution utility not later than April 1, 2001. Subsection (d) directs the Commission to hold hearings and approve or modify the proposed tariff and make the tariff effective January 1, 2002. The Commission intends to comply with this statutory scheme and set Entergy's transmission and distribution rates in this proceeding and will not require Entergy to file a rate case in November 2001.

As the statutory start date for retail competition approached, EGSI requested that the PUC, as authorized by section 39.103 of PURA, postpone the start of retail competition in EGSI's service area. In late 2001, in Docket No. 24469, EGSI, the staff of the PUC, and various other signatories[4] entered into an agreement (the "Settlement Agreement") whereby retail competition in EGSI's service territory would be postponed until September 15, 2002, or later if necessary. The Settlement Agreement was adopted in a December, 2001 PUC order. During the interim, EGSI would continue to charge its customers the rates frozen by Senate Bill 7.

In February 2002, Dale Shearer and several other EGSI ratepayers, the plaintiffs in the underlying case, brought suit in district court alleging that Entergy and EGSI breached the Merger Agreement when they entered into the Settlement Agreement because the two agreements' terms are inconsistent. That is, Shearer alleges that the Settlement Agreement conflicts with the Merger Agreement's requirement that a third proceeding be filed with the PUC and that certain merger-related savings inure to the ratepayers.

In the trial court, Entergy filed a Motion to Transfer Venue, a Motion to Dismiss for Want of Subject Matter Jurisdiction, and a Motion to Abate. After conducting multiple hearings, the trial court denied Entergy's motions. Entergy then sought a writ of mandamus from the court of appeals on the same motions, but was again denied. We agreed to consider Entergy's petition for writ of mandamus to determine if the trial court had subject matter jurisdiction over the lawsuit.

## II. Mandamus

■ Mandamus relief is appropriate only if the court clearly abused its discretion and the relator has no adequate remedy by appeal. *In re Southwestern Bell Tel. Co.*, 35 S.W.3d 602, 605 (Tex.2000). As a general rule, mandamus does not lie to correct incidental trial court rulings when there is a remedy by appeal. *Bell Helicopter Textron, Inc. v. Walker*, 787 S.W.2d 954, 955 (Tex.1990) (concluding that mandamus was not appropriate to review trial court's ruling on plea to the jurisdiction).

■ The reluctance to issue extraordinary writs to correct incidental trial court rulings can be traced to a desire to prevent parties from attempting to use the writ as a substitute for an authorized appeal. *See, e.g., United States Alkali Export Ass'n v. United States*, 325 U.S. 196, 202–03, 65

---

4. The other signatories were Texas Industrial Energy Consumers and CLECO Marketing and Trading L.L.C.

S.Ct. 1120, 89 L.Ed. 1554 (1945) (recognizing that "hardship is imposed on parties who are compelled to await the correction of an alleged error at an interlocutory stage by an appeal from final judgment"). This Court has long held that the mere cost and delay of pursuing an appeal will not, in themselves, render appeal an inadequate alternative to mandamus review. *See Iley v. Hughes*, 158 Tex. 362, 311 S.W.2d 648, 652 (1958) ("[T]hat there may be some delay in getting questions decided through the appellate process, or that court costs may thereby be increased, will not justify intervention by appellate courts through the extraordinary writ of mandamus.").

■ In certain circumstances, we have recognized that incidental trial court rulings can be corrected by writ of mandamus. *See, e.g., Geary v. Peavy*, 878 S.W.2d 602, 603 (Tex.1994) (concluding that mandamus was appropriate to resolve jurisdictional dispute between Texas and Minnesota courts that led to conflicting child custody orders); *State Bar of Tex. v. Jefferson*, 942 S.W.2d 575, 575–76 (Tex. 1997) (granting mandamus relief after concluding that trial court was without jurisdiction to issue temporary restraining order staying administrative grievance proceeding).

■ In each of these instances, the Court exercised its jurisdiction not merely because inaction would have caused hardship to the parties, but because special, unique circumstances mandated the Court's intervention. Here, the possibility that Entergy will be forced to endure the "hardship" of a full-blown trial if we decline to issue a writ of mandamus is, in itself, not sufficient to dictate mandamus relief. But Entergy's hardship is not the only factor we consider in deciding whether mandamus is appropriate. We must also consider that if Entergy is correct in its assertion that the PUC has exclusive jurisdiction, permitting a trial to go forward would interfere with the important legislatively mandated function and purpose of the PUC. *Cf. State v. Sewell*, 487 S.W.2d 716, 719 (Tex.1972) (granting mandamus to vacate injunction barring Grievance Committee proceedings because injunction was "an interference with the grievance procedures authorized by ... the State Bar Act" and restating that mandamus may be appropriate when "the orderly processes of government" are disturbed); *U.S. Alkali*, 325 U.S. at 203–04, 65 S.Ct. 1120 (concluding that extraordinary writ would be appropriate to correct federal district court's denial of motion to dismiss complaint if Federal Trade Commission had jurisdiction). In short, if the PUC has exclusive jurisdiction in this dispute, the judicial appropriation of state agency authority would be a clear disruption of the "orderly processes of government." This disruption, coupled with the hardship imposed on Entergy by a postponed appellate review, warrants an exception to our general proscription against using mandamus to correct incidental trial court rulings.

### III. Applicable Law

■ Entergy asserts that the PUC has exclusive jurisdiction over the dispute between Shearer and Entergy. An agency has exclusive jurisdiction when the Legislature has granted that agency the sole authority to make an initial determination in a dispute. *Subaru of Am. v. David McDavid Nissan*, 84 S.W.3d 212, 221 (Tex. 2002); *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 18 (Tex.2000). Furthermore, "[i]f an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking review of the agency's action." *Cash Am.*, 35 S.W.3d at 15. Until the party has exhausted all administra-

tive remedies, the trial court lacks subject matter jurisdiction and must dismiss any claim within the agency's exclusive jurisdiction. *David McDavid Nissan*, 84 S.W.3d at 221 (citing *Tex. Educ. Agency v. Cypress-Fairbanks Indep. Sch. Dist.*, 830 S.W.2d 88, 90 (Tex.1992); *Tex. Bd. of Exam'rs in Optometry v. Carp*, 162 Tex. 1, 343 S.W.2d 242, 246 (Tex.1961)). Therefore, if Entergy's assertion that the PUC has exclusive jurisdiction is correct, the trial court lacks jurisdiction over the underlying lawsuit. Our primary inquiry then is whether the PUC has exclusive jurisdiction over the dispute. This is a question of law we review *de novo*. *David McDavid Nissan*, 84 S.W.3d at 222.

## IV. Analysis

### A

■ We begin our analysis by recognizing the constitutional presumption that district courts are authorized to resolve disputes. Pursuant to the Texas Constitution, a district court's jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." Tex. Const. art. V, § 8. An important corollary is that district courts are courts of general jurisdiction and generally have subject matter jurisdiction absent a showing to the contrary. *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex.2000). Notably, a similar presumption does not exist for administrative agencies, which may exercise only those powers the law confers upon them in clear and express statutory language and those reasonably necessary to fulfill a function or perform a duty that the Legislature has expressly placed with the agency. *David McDavid Nissan*, 84 S.W.3d at 220; *Pub.*

*Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex.1995).

The next step in the inquiry is to determine if the "Constitution or other law" conveys exclusive, appellate, or original jurisdiction on another court or administrative agency. Tex. Const. art. V, § 8. Here, Entergy asserts that PURA grants the PUC exclusive jurisdiction over Shearer's claims.

■ Whether an agency has exclusive jurisdiction depends on statutory interpretation. *David McDavid Nissan*, 84 S.W.3d at 221. An agency has exclusive jurisdiction " 'when a pervasive regulatory scheme indicates that Congress intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed.' " *Id.* (quoting Humphrey, Comment, *Antitrust Jurisdiction and Remedies in an Electric Utility Price Squeeze*, 52 U. Chi. L.Rev. 1090, 1107 n. 3 (1985)). The same rule applies when our courts determine the intent of the Legislature. *David McDavid Nissan*, 84 S.W.3d at 221.

■ In construing PURA or any other statute, our objective is to determine and give effect to the Legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex.2003). We look to the " 'plain and common meaning of the statute's words.' " *Id.* (quoting *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex.2002)). When a statute's meaning is unambiguous, we interpret that statute according to its plain language. *Id*

■ PURA's language is determinative in assessing whether the Legislature created a pervasive regulatory scheme intended to be the exclusive means by which the rates charged by successor entities as a result of a merger of electric utilities are addressed. Section 31.001 of PURA, a

general provision entitled "Legislative Findings; Purpose of Subtitle," states:

> (a) This subtitle is enacted to protect the public interest inherent in the rates and services of electric utilities. The purpose of this subtitle is to establish a *comprehensive and adequate regulatory system* for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities.

PURA § 31.001(a) (emphasis added). In addition, section 32.001 of PURA describes the PUC's jurisdiction as follows:

> (a) Except as provided by Section 32.002 [governing municipally owned utilities], the Commission has *exclusive original jurisdiction* over the rates, operations, and services of an electric utility in:
>
> > (1) areas outside a municipality; and
> >
> > (2) areas inside a municipality that surrenders its jurisdiction to the Commission under Section 33.002.

PURA § 32.001(a) (emphasis added). Thus, the statutory description of PURA as "comprehensive" demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas. That is, PURA is intended to serve as a "pervasive regulatory scheme" of the kind contemplated in *David McDavid Nissan.*

Furthermore, section 32.001's specific grant to the PUC of "exclusive original jurisdiction" makes it clear that the Legislature intended this dispute regarding utility rates, operations, and services to begin its journey toward resolution at the PUC. Our conclusion that the phrase "exclusive original jurisdiction" grants the PUC exclusive jurisdiction is consistent with this Court's earlier jurisprudence. In *David McDavid Nissan,* we held that statutory language granting the Texas Motor Vehi-

cle Board "exclusive original jurisdiction" meant exactly what it said: that the Texas Motor Vehicle Board has exclusive jurisdiction over matters governed by the Texas Motor Vehicle Commission Code. *David McDavid Nissan,* 84 S.W.3d at 223. We see no reason why identical language in PURA should be assigned a different meaning.

In cases like this one, where the Legislature clearly expresses its intent through statutory language, our exclusive jurisdiction inquiry is uncomplicated. Here, the Legislature's language demonstrates that it intended PURA to be the exclusive means of regulating electric utilities in Texas. The Legislature's description of PURA as "comprehensive," coupled with the fact that PURA regulates even the particulars of a utility's operations and accounting, demonstrates the statute's pervasiveness. *See, e.g.,* PURA § 14.202 (allowing PUC to audit utilities as frequently as needed); PURA § 36.056 (empowering PUC to establish proper rates of depreciation, amortization, and depletion); PURA § 38.004 (mandating clearance requirements for transmission and distribution lines). Accordingly, we conclude that the PUC has exclusive jurisdiction over the dispute between Entergy and Shearer.

## B

Shearer attempts to categorize the Merger Agreement as a mere private contract. Shearer contends that because the plaintiffs are not directly challenging a PUC order, the PUC has no jurisdiction to settle the dispute. However, this argument fails to recognize that while the Merger Agreement may have begun as a private contract, it took on an administrative character when the parties agreed that the merger savings would be implemented "in post-merger Gulf States rate proceedings" filed with the PUC and re-

quested that their agreement be placed in the PUC order resolving Docket No. 11292.

The Third Court of Appeals addressed a similar situation in *Public Utility Commission of Texas v. Southwestern Bell Telephone Co.*, 960 S.W.2d 116, 119–20 (Tex. App.—Austin 1997, no pet.):

> We hold that the power to conduct adjudicative proceedings, expressly delegated to the Commission in PURA section 16, necessarily includes the following incidental powers: (1) a power to accept and act upon an agreement between the parties that removes from dispute and litigation a subsidiary issue of fact or law, such as the parties' agreement pertaining to attorney's fees in this instance; (2) a power to interpret the agreement when a dispute arises subsequently in that regard; and (3) a power to formulate and award a reasonable remedy necessary to effectuate the agreement.

On rehearing, Southwestern Bell argued that the PUC, in interpreting the attorneys' fees agreement, was adjudicating a private contract right. The court of appeals responded:

> The agency record in the present case reveals, however, that the attorneys' fee agreement was more than a private agreement. It affected directly the public interest. The Commission's acceptance of the agreement ... was necessary to give the agreement the *administrative* effect required by the litigants. Based upon the Commission's acceptance of the agreement, the Commission formulated and issued a final order ... *fixing public utility rates.* We have held PURA section 16 and Texas Government Code section 2001.056 vested authority in the Commission for taking this administrative action. These statutes also placed in

the Commission a power to decide as a *regulatory* matter the dispute that arose subsequently regarding the agreement, and to award an *administrative remedy* to rectify any administrative wrong and any resulting *administrative* consequences.

*Id.* at 122–23 (emphasis in original). Likewise, in this case, the Merger Agreement between Entergy, GSU, and the various other parties affected the public interest and, more importantly, was the basis for the PUC's regulatory approval of the Entergy/GSU merger. Without the PUC order implementing it, the Merger Agreement was practically meaningless. That is, the very administrative character that gives the Merger Agreement effect also gives the PUC the authority to adjudicate disputes arising from the agreement. *Cf. Cajun Elec. Power Coop., Inc. v. F.E.R.C.*, 924 F.2d 1132, 1135 (D.C.Cir.1991) ("Any agreement that must be filed and approved by an agency loses its status as a strictly private contract and takes on a public interest gloss....").

## V. Conclusion

We conclude that the PUC has exclusive jurisdiction over the dispute between Entergy and Shearer. Accordingly, we conditionally grant the writ of mandamus and direct the trial court to vacate its August 13, 2002 order denying Entergy's motion to dismiss, and to dismiss Shearer's suit against Entergy for lack of subject matter jurisdiction. We are confident that the trial court will promptly comply, and the writ will issue only if it does not.