# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00282-CV

**City of Allen and Coalition of Cities, Appellant**

**v.**

**Public Utility Commission of Texas,;Oncor Electric Delivery Company; and Centerpoint Energy, Inc., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GV3-02966, HONORABLE MARGARET COOPER, JUDGE PRESIDING**

## O P I N I O N

In this appeal, we must decide whether the Public Utility Commission has jurisdiction under the Public Utilities Regulatory Act (PURA) to review certain ordinances that a city claims to have enacted based on its police power. The City of Allen and a coalition of cities[1] appeal from a district court judgment partially dismissing the Cities' appeal and partially affirming the Commission's summary decision that invalidated four municipal ordinances because of their conflict with Oncor Electric Delivery Company's[2] tariffs, PURA, and the Commission's rules. For the reasons discussed below, we affirm the district court's order.

---

[1] The coalition members are the cities of Addison, Austin, Bedford, Colleyville, Denton, El Paso, Farmers Branch, Grapevine, Hurst, Keller, Missouri City, North Richland Hills, Pasadena, Tyler, Westlake, West University Place, and Wharton. We will refer to the coalition and Allen collectively as "Cities."

[2] Oncor Electric Delivery Company is now known as TXU Electric Delivery Company. Oncor and Centerpoint Energy, Inc. will be referred to collectively as the "Utilities."

**BACKGROUND**

In 1999, the legislature began dismantling Texas's electric utility regulation.[3] The legislature revised PURA to allow determination of retail electric rates by competition. *See City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 235 (Tex. 2001). Oncor is a transmission and distribution company created as part of TXU Electric Company's unbundling[4] during the electricity deregulation process. Because electric transmission and distribution has not phased into the competitive market, the Commission continues to govern Oncor, including analysis and approval of Oncor's tariff. *See* Tex. Util. Code Ann. § 39.201 (West Supp. 2004-05); 16 Tex. Admin. Code § 25.214(c) (2004) (Public Util. Comm'n, Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities). Oncor is certificated to distribute electric service in Allen, Texas.

Allen is a home rule city under the Texas Constitution's home rule amendment. Tex. Const. art. XI, § 5 (amended 1912). The home rule amendment altered the longstanding practice of having special charters individually granted and amended by the legislature for the State's larger cities. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 26 & n.5 (Tex. 2003). Cities adopting

---

[3] The legislature found that the production and sale of electricity was not a monopoly warranting regulation of rates, operations, and services and that the public interest in competitive electric markets required that, except for transmission and distribution services and for the recovery of stranded costs, electric services and their prices should be determined by customer choices and the normal forces of competition. The legislature enacted [PURA] to protect the public interest during the transition and establishment of a fully competitive electric power industry. Tex. Util. Code § 39.001(a) (West Supp. 2004-05).

[4] "Unbundling" required each electric utility to separate its business activities from one another into the following units: (1) a power generation company, (2) a retail electric provider, and (3) a transmission and distribution utility. Tex. Util. Code § 39.051(b) (West Supp. 2004-05).

a home rule charter have the full power of self government and look to the legislature only for limitations on their power. *Id.* Beginning in 2000, Allen enacted "zoning development standards" in its land development code that required utilities to: (1) place certain electric distribution[5] lines underground, (2) screen electric meters and other electric distribution facilities from view, and (3) substitute metal or concrete distribution line poles for wooden poles—all at the utility's expense.[6] After enacting these ordinances, Allen denied two of Oncor's construction permits for failure to comply with the electrical undergrounding specifications.

Oncor challenged the ordinances in an appeal to the Commission. The Commission's preliminary order stated that the Commission had jurisdiction to consider Oncor's appeal, and that Allen exceeded its authority when it passed the ordinances in question. The Commission referred the matter to the State Office of Administrative Hearings (SOAH),[7] to analyze the applicability of an analogous decision concerning the Commission's jurisdiction to review municipal ordinances that required undergrounding utility lines and screening facilities. *See* Tex. Pub. Util. Comm'n, *Application of Texas Utilities Electric Company to Obtain a CCN for the Trophy Club-Coppell-Euless 138 kV Transmission Line; Appeals of Brazos Electric Power Cooperative, Inc., Tri-County Electric Cooperative, Inc. and Texas Utilities Electric Company of an Ordinance of the Town of*

---

[5] A "distribution" line is a power line operated below 60,000 volts, when measured phase-to-phase. *See* 16 Tex. Admin. Code § 25.5 (31) (2004) (Public Util. Comm'n, Definitions).

[6] Developers are responsible for the cost of extending utility services with underground installation to new subdivisions. *See* Allen, Tex., Land Development Code, art. VII, §§ 7.03.5.5, 7.07.3e, 8.10.4e (2002). No developer was associated with Oncor's projects.

[7] The coalition of cities and Centerpoint Energy, Inc. intervened in the case while it was before the State Office of Administrative Hearings.

*Westlake, Texas; Appeals of Texas Utilities Electric Company and Brazos Electric Power Cooperative, Inc. of an Ordinance of the Town of Trophy Club, Texas*, Docket Nos. 6117, 6170-72; 1986 Tex. P.U.C. LEXIS 292, at *5.

While the case was before SOAH, the Commission's staff moved for summary decision, arguing that there were not any issues of material fact to be resolved at the evidentiary hearing. In her proposal for decision, the administrative law judge recommended that the Commission issue a summary decision for Oncor and invalidate the ordinances as a matter of law, because the ordinances violated PURA and impaired the public interest by requiring that Oncor install non-standard facilities at its own expense.

After the administrative law judge released the proposal for decision—but before the Commission issued its order—Allen repealed the portions of the ordinances that required undergrounding lines and wooden pole replacement.[8] Applying exceptions to the mootness doctrine,[9] the Commission invalidated the sections of Allen's ordinances that required undergrounding, wooden pole replacement, and screening of facilities, to the extent that they imposed the expense of installing non-standard electric distribution facilities on Oncor, in violation of its tariff, PURA, and Commission rules.

---

[8] The portions of the ordinances requiring screening of utility facilities were not repealed.

[9] The Commission found two types of mootness exceptions applicable: the "capable of repetition, yet evading review" and "public interest" exceptions. First, it noted that Allen could repeat its actions and evade a ruling by reenacting ordinances like the ones at issue, waiting for the proposal for decision—and if it is unfavorable to them—repealing the ordinances before the Commission issues its order. Second, the Commission determined that addressing the ordinances' invalidity served the public interest by preventing other cities from adopting similar ordinances, and precluding negative impacts to the electric utilities' transmission system and market competition.

On administrative appeal, the district court ruled that it lacked jurisdiction to consider the Cities' moot challenge to the Commission order invalidating the undergrounding and pole replacement provisions of the ordinances. The court partially dismissed the Cities' appeal and ruled that the remainder of the Cities' challenges lacked merit.[10]

In a single point of error, the Cities challenge the Commission's appellate jurisdiction over the ordinances in Allen's land development code. They contend that Allen's ordinances were not promulgated to regulate Oncor, but to protect the health, safety, and welfare of Allen's citizens, that is, as an exercise of police power. The Cities ask this Court to "vacate the Commission order and reverse the district court's order as to its finding of Commission jurisdiction."

## ANALYSIS

**Motion to Dismiss**

The Utilities and the Commission moved to dismiss this appeal, asserting that we cannot reach the question of the Commission's jurisdiction over the undergrounding and pole

---

[10] The district court's final judgment, in relevant part, states:

The Court finds that the Court has no jurisdiction to consider the Cities' challenges to the Commission's order invalidating parts of the ordinances of the City of Allen that were repealed by City of Allen Ordinance No. 2137-1-03 because Cities' appeal to this Court is moot and no exception to the mootness doctrine applies, and that the remainder of Cities' challenges are without merit.

Accordingly it is ORDERED, ADJUDGED, and DECREED that the Cities' appeal is dismissed as to those portions of the Commission's Order in Docket No. 25429 concerning the ordinances repealed by City of Allen ordinance No. 2137-1-03, and in all other respects renders judgment that the Commission's order in Docket No. 25429 is affirmed, and that plaintiffs take nothing.

5

replacement provisions in the ordinances without addressing the district court's refusal to rule on them, and that the Cities waived this point of error due to inadequate briefing.

However, the question of jurisdiction is fundamental and can be raised at any time in the trial of a case or on appeal. *Public Util. Comm'n v. J.M. Huber Corp.*, 650 S.W.2d 951, 955 (Tex. App.—Austin 1983, writ ref'd n.r.e.). Administrative agencies may exercise only those powers the law confers upon them in clear and express statutory language and those reasonably necessary to fulfill a function or perform a duty that the legislature has expressly placed with the agency. *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004).

We liberally construe the points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982). We look not only at the wording of the points of error, but also at the argument under each point to best determine the intent of the party. *Id*. Read fairly, the Cities' brief complains about the district court's failure to vacate[11] the Commission's order—after the court determined that the Cities' challenges to the repealed provisions were moot—because it allowed the Commission's ruling,

_____

[11] We note that the district court lacked power to vacate the Commission's order. The Cities' brief acknowledges that section 2001.174 of the government code applied to their suit for judicial review. Tex. Gov't Code Ann. § 2001.174 (West 2000). That section authorizes the reviewing court to reverse or remand—but not vacate—an agency decision if the agency's findings, inferences, conclusions, or decisions exceeded its statutory authority. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 109 S.W.3d 130, 137-38 (Tex. App.—Austin 2003, no pet.) (district court erred in vacating void Commission order); *BFI Waste Sys., Inc. v. Martinez Envtl. Group*, 93 S.W.3d 570, 581 (Tex. App.—Austin 2002, pet. denied) (district court lacked authority to vacate Commission's order; appellate court construed judgment as reversal of Commission's order); *see also* Tex. Gov't Code Ann. § 2001.174(2)(B) (West 2000) (court reviewing a state agency's decision in a contested case may either affirm, reverse, or remand case to agency for further proceedings). Thus, the Cities' complaint that the district court "failed to vacate" the Commission's order is erroneous, because the district court lacked such authority.

which invalidated parts of the ordinances, to stand. The Cities also ask that "the district court's order be reversed as to its finding of Commission jurisdiction" over the screening portions of the ordinances. The district court's judgment did not alter the effect of the Commission's order and the Cities have not waived the issue of whether the Commission lacked jurisdiction to review Allen's four ordinances. Accordingly, we deny the motion to dismiss.

**Scope and Standard of Review**

The district court affirmed the Commission's order concerning the non-repealed screening requirements (". . . in all other respects [the court] renders judgment that the Commission's order in Docket No. 25429 is affirmed, and that plaintiffs take nothing"). The court did not rule on whether the Commission had appellate jurisdiction over the repealed provisions in Allen's ordinances; it dismissed that part of the Cities' appeal as moot ("Accordingly it is ORDERED, ADJUDGED, and DECREED that the Cities' appeal is dismissed as to those portions of the Commission's Order in Docket No. 25429 concerning the ordinances repealed by City of Allen ordinance No. 2137-1-03 . . . ."). The court's refusal to rule on the repealed provisions of the ordinances (undergrounding and pole replacement) does not constitute a finding that the Commission lacked jurisdiction to review these provisions. Accordingly, we will address the issue of the Commission's appellate jurisdiction over the repealed and non-repealed portions of the municipal ordinances. The Commission's appellate jurisdiction over Allen's ordinances is a question of law that we review *de novo*. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 109 S.W.3d 130, 135 (Tex. App.—Austin 2003, no pet.).

7

**Allen's Ordinances**

Oncor sought construction permits for two new projects designed to meet peak energy demands during the summer of 2002. The proposed projects called for installation of an overhead distribution line located within Oncor-owned easements, Allen's rights-of-way, and state rights-of-way. Oncor's projects were not associated with any particular development project. Allen denied Oncor's permits, based on the undergrounding requirements in its land development code.

The Cities appeal the Commission's jurisdiction to review four ordinances in Allen's land development code. The first ordinance, passed June 15, 2000, stated:

1. All utilities, including, but not limited to, electrical, gas, and telephone shall be placed underground, except that electrical transmission and main feeder lines (12.5 or more Kilovolts) may be located overhead.

2. Utility meters and other utility apparatus, including, but not limited to, transformers, shall be located to the rear of the structure unless adequately screened from view of public streets and adjoining properties. Adequately screened from view shall include screening, as well as the utilization of landscaping and other site elements.

3. All required screening shall meet clearances required by affected utility companies. Wall-mounted equipment, including meters (such as banks of electric meters on the rear or side wall of multi-tenant buildings), shall be screened from public streets by one of the following methods.

   a. Landscaping, including trees or evergreen shrubbery.

   b. Masonry walls in conjunction with landscaping.

   c. Wall-mounted screening devices, such as cabinets or partitions which are architecturally compatible with the facade.

Allen, Tex., Land Development Code, art. VII, §§ 7.03.5, 7.07.3, 8.10.3c (2000).

8

The second ordinance, passed May 3, 2001, left the screening provisions unchanged, but expanded the scope of the utilities included in the undergrounding provision, and added a new subsection that required the utility to pay for the undergrounding:

1. All utilities, existing and proposed, adjacent to and within new development, including, but not limited to, electrical, gas, television and telephone/telecommunication shall be placed underground, except that electrical transmission [(]59 or more Kilovolts) may be located overhead, providing that this requirement does not conflict with existing utility service regulations.

2. New development shall assume responsibility for all expense related to the underground placement of utilities. . . .

*Id*. §§ 7.03.5, 7.07.3, 8.10.3c (2001).

The third ordinance, passed September 6, 2001, made only one change, limiting the undergrounding provision to new utility installations:

1. All new utilities, including, but not limited to, electrical, gas, television and telephone/telecommunication shall be placed underground, except that electrical transmission 59 or more Kilovolts may be located overhead, providing that this requirement does not conflict with existing utility service regulations.

*Id*. §§ 7.03.5, 7.07.3, 8.10.3c (2001).

The fourth ordinance, passed January 17, 2002, left the screening provisions mostly unchanged, but added several new sections, including one requiring replacement of wooden poles with metal or concrete poles at the utility's (service provider's) expense:

1. All new residential utility installations, including, but not limited to, electrical, gas, television and telephone/telecommunication shall be placed underground.

9

2. All new non-residential utility installations, including but not limited to, electrical, gas, television and telephone/telecommunication shall be placed underground where service is provided adjacent to public street or right-of-way. Where electrical service is provided from an alley or rear easement not located adjacent to a public street, primary electrical service may be provided overhead along the property line. Primary and secondary service routed on the site shall be placed underground.

3. All new construction within the public street rights-of-way shall be located underground. Where a street is scheduled for reconstruction, new development may be required to provide an escrow of the difference between overhead and underground service.

4. Nothing herein shall prevent temporary service during construction from being located overhead.

5. New development shall assume responsibility for all expense related to the underground placement of utilities.

6. Any upgrade or reinforcement of facilities with existing overhead service by the service provider shall require replacement of wooden poles with metal or concrete poles at the expense of the service provider. An "upgrade" for purposes of this section, shall mean any change that requires the installation, re-installation or addition of a new pole. In-line poles necessary for service drops will be reviewed by the City Engineer, and may be approved on a case-by-case basis.

7. Any upgrade or reinforcement of facilities with underground service by the service provider shall be placed underground at the expense of the service provider.

8. Utility meters and other utility apparatus, including, but not limited to transformers and switch boxes, shall be located to the rear of the structure unless adequately screened from view from public streets and adjoining properties and shall be suitable for access required for service and maintenance. Adequately screened from view shall include screening walls, as well as the utilization of landscaping and other site elements.

9. All required screening shall meet clearances required by affected utility companies and shall be suitable for access required for service and maintenance. Wall-mounted equipment, including meters (such as banks of electric meters on

the rear or side wall of multi-tenant buildings), shall be screened from public streets by one of the following methods.

    a.    Landscaping, including trees or evergreen shrubbery.

    b.    Masonry walls in conjunction with landscaping.

    c.    Wall-mounted screening devices, such as cabinets or partitions which are architecturally compatible with the facade.

10.  Electrical transmission [(]59 or more Kilovolts) may be located overhead.

*Id*. §§ 7.03.5, 7.07.3, 8.10.4 (2002).

**Allen's Ordinances as Exercises of Authority over Rights-of-Way or Utility Regulation**

The Cities contend that Allen's zoning development standards were not promulgated to regulate Oncor, but to protect the health, safety, and welfare of Allen's citizens, that is, as an exercise of police power. They defend Allen's ordinances as conditions on Oncor's use of city streets and rights-of-way:

> A home rule municipality has the following powers: (1) To prohibit the use of any street . . . of the city by any telegraph, telephone, electric light . . . gas company, or any other character of public utility without first obtaining the consent of the governing authorities expressed by ordinance and upon paying such compensation as may be prescribed and upon such condition as may be provided by any such ordinance.

Tex. Rev. Civ. Stat. Ann. art. 1175, § 1 (West Supp. 2004-05).

The Cities acknowledge that an electric utility has the right to "construct, maintain, and operate lines over, under, across, on, or along a state highway, a county road, a municipal street or alley, or other public property in a municipality," but emphasize that the utility may exercise that

11

authority "with the consent of and subject to the direction of the governing body of the municipality." *See* Tex. Util. Code Ann. §§ 181.042-.043 (West 1998). Thus, the Cities argue that municipalities may designate the location of utility facilities that are to be placed in its rights-of-way[12] and the screening of those facilities, so long as these ordinances are not unreasonable or arbitrary, and do not violate the constitution and laws of the state. *See Dykes v. City of Houston*, 406 S.W.2d 176, 181 (Tex. 1966). Additionally, the Cities claim that Allen's zoning ordinances enjoy a presumption of validity; courts cannot interfere unless it appears that:

> the ordinance represents a clear abuse of municipal discretion, and the "extraordinary" burden rests on one attacking the ordinance to show that no conclusive, or even controversial or issuable fact or condition existed which would authorize the governing board of the municipality to exercise the discretion confided to it in the passage of that part of the zoning ordinance under attack.

*City of Bellaire v. Lampkin*, 317 S.W.2d 43, 45 (Tex. 1958).

Nevertheless, the Utilities and the Commission assert that the Cities rely on authorities that pre-dated PURA, and that the ordinances were an exercise of Allen's original jurisdiction over Oncor's rates, operations and services:

> To provide fair, just, and reasonable rates and adequate and efficient services, the governing body of a municipality has exclusive original jurisdiction over the rates, operations, and services of an electric utility in areas in the municipality, subject to the limitations imposed by this title [PURA].

---

[12] At oral argument, the Cities acknowledged that the application of these ordinances is not limited to Allen's rights-of-way. Thus, Allen's ordinances do not merely condition the use of, or control access to, its streets and rights-of-way.

12

Tex. Util. Code Ann. § 33.001(West 1998).  The Utilities and the Commission also assert that Allen's regulatory authority cannot exceed that of the Commission, and Allen may not regulate in a manner different from the Commission.  *See* Tex. Util. Code Ann. § 33.004(b) (West 1998).

Because Allen denies that its zoning development standards were an exercise of its "exclusive original jurisdiction over the rates, operations, [or] services of an electric utility," it disputes the applicability of the statute authorizing the Commission's appellate jurisdiction.  Tex. Util. Code Ann. § 32.001(b) (West 1998) ("The commission has exclusive appellate jurisdiction to review an order or ordinance of a municipality exercising exclusive original jurisdiction under this subtitle.")

To determine whether Allen exercised its exclusive original jurisdiction over Oncor's "rates, operations, and services" by promulgating these ordinances, we examine the definitions of these terms.

**The Ordinances Regulate Oncor's "Rates" as Defined by Oncor's Tariff**

A utility's rates are set forth in its tariff, which contains all charges stated separately by type of service, the rules and regulations of the utility, and any contracts that affect rates, charges, terms or conditions of service.  *See* 16 Tex. Admin. Code § 25.5 (131) (2004) (Public Util. Comm'n, Definitions).  Oncor was required to adopt a tariff and obtain the Commission's approval of it.  *See id*. § 25.241 (West 2002); Tex. Util. Code Ann. § 39.201 (West Supp. 2004-05).  The tariff had to include terms from a Commission-approved, pro forma tariff.  *See id*. § 25.214 (c)-(d) (West 2002).

13

Allen's ordinances conflict with the provisions in Oncor's tariff that require customer payment for installation of non-standard electrical distribution facilities:[13]

> Company is responsible for the construction, extension, upgrade, or alteration of Delivery System Facilities necessary to connect Retail Customer's Point of Delivery to Company's Delivery System in conjunction with Section 5.7 FACILITIES EXTENSION POLICY and the terms and conditions contained herein. Company makes extension of Delivery System Facilities to Retail Customer's electrical installation so as to *minimize the cost of such extension.* Extension is normally made at no cost to Retail Customer except in those instances where the cost of the requested extension of Company's facilities is in excess of the standard allowances stated herein, or where *the installation of non-standard facilities is requested.* In these instances, a contribution in aid of construction ("CIAC") is required from Retail Customer for all extensions where the estimated cost of the extension is in excess of the standard allowances.

Oncor's Tariff for Retail Delivery Services § 6.1.2.2.1 (emphasis added).

The tariff defines "standard distribution facilities" as those necessary to transport electric power:

> Company's standard distribution facilities consist of the Delivery System facilities *necessary to transport electric power* and energy from a single, single-phase or three phase distribution source to Retail Customer at one Point of Delivery, with one standard Company Meter, at one of Company's available standard voltages.

*Id*. § 6.1.2.2.1.1 (emphasis added). Conversely, "non-standard facilities" are those exceeding what is normally required for service:

---

[13] "Facilities" means all of the plant and equipment of a public utility, and includes tangible and intangible property, without limitation, owned, operated, leased, licensed, used, controlled, or supplied for, by, or in connection with the business of the public utility. Tex. Util. Code Ann. § 11.003(10) (West Supp. 2004-05).

14

Non-standard facilities include but are not limited to a two-way feed, automatic and manual transfer switches, service through more than one point of delivery, redundant facilities, facilities *in excess of those normally required for service*, or facilities necessary to provide service at a non-standard voltage. If Retail Customer desires Delivery Service utilizing non-standard facilities, as described above, and not covered elsewhere in these Service Regulations, then Company may construct such facilities pursuant to Section 5.7.5, NON-STANDARD FACILITIES and Section 6.1.2.2.6, NON-STANDARD FACILITY EXTENSIONS.

*Id*. § 6.1.2.2.2 (emphasis added).

Undergrounding distribution lines, replacing wooden poles with metal or concrete poles, and screening facilities with landscaping, walls, or cabinets does not "minimize the cost of facility extension" as required by Oncor's tariff. An Oncor electrical engineer, John C. Soward, testified that installation of an underground feeder circuit in Allen's project is twice as expensive as overhead construction—a difference of about $1.1 million.[14] He further testified that the cost of using metal or concrete poles is about three times that of an equivalent feeder with wooden poles.[15] He also stated that screening facilities by use of landscaping, masonry walls, or mounted cabinets introduces another set of unplanned costs.

---

[14] Soward arrived at this figure by estimating the costs for one mile of total overhead circuit and the cost for one mile of functionally equivalent underground circuit. He then calculated a cost differential factor by dividing the underground circuit cost by the overhead circuit cost. He applied this factor to the overhead components of Allen's project and divided the total amount by the original cost.

[15] Soward arrived at this figure by calculating the cost of one mile of standard overhead feeder on wooden poles. He then calculated the difference between a concrete or steel pole and a wooden pole. After that, he multiplied the cost difference per pole by the number of poles in the mile of line, and added that product to the base cost, yielding the cost for a line with concrete or steel poles. He identified the cost differential factor as the cost of an overhead line with concrete or steel poles, divided by the cost of the standard overhead line with wooden poles.

Furthermore, the ordinances' specifications are unnecessary "to transport electric power" as referenced in the tariff. Nothing in the Commission's rules concerning electrical service reliability and continuity requires underground installation of distribution lines. *See* 16 Tex. Admin. Code § 25.52 (2004) (Public Util. Comm'n, Reliability and Continuity of Service).

In fact, one concern of the Utilities and the Commission about undergrounding distribution lines is the adverse affect it may have on continuity of electrical service. Soward testified that special equipment is required to locate underground lines, and that buried lines lengthen repair time. He also remarked that underground systems must be built with greater precision, to avoid damage or contact with other underground utilities, and greater redundancy, to achieve acceptable levels of reliability performance and to compensate for greater fault location and repair times. Soward stated that repair times are only prolonged by hiding facilities from view.

Because electrical service may be delivered by overhead lines at minimum cost, while underground systems require specialized equipment, greater redundancy, and higher expense, underground facilities are "in excess of those normally required for service" as specified by the tariff and thus, are "non-standard." Similarly, utility construction that includes metal or concrete poles and facility-concealing landscaping, walls, or cabinets exceeds what is "necessary to transport electric power" and does not "minimize the cost of extension." Such installations are also "non-standard."

Design considerations sometimes require the use of non-standard facilities. Soward testified that underground feeders are used in congested areas where overhead lines would not be technically or economically feasible—such as downtown Dallas and Fort Worth—and in locations

16

adjacent to large substations. He also stated that Oncor uses concrete and steel poles when the stresses on wooden poles would be excessive, for example, around sharp street curves or for abnormally lengthy line spans. He observed that parts of Allen's project already have underground lines or concrete and steel poles as a result of such electrical design considerations.

But if Allen requests non-standard facilities—for reasons unrelated to design necessity[16]—the tariff requires that Allen is responsible for the increased cost:

> If Retail Customer desires Delivery System service which involves non-standard facilities as described in Section 6.1.2.2.1.2 of this Tariff, in addition to the cost in excess of the standard allowance in described in Section 6.1.2.2.5.3 for construction of standard facilities, if any, Retail Customer pays Company prior to Company's construction of non-standard facilities the total estimated cost of all non-standard facilities to meet Retail Customer's request. Company may terminate the provision of any Delivery Service utilizing non-standard facilities at the end of the contract term, or in the absence of a contract term, on reasonable notice to Retail Customer's Competitive Retailer.

Oncor's Tariff for Retail Delivery Services § 6.1.2.2.6. The Commission's pro forma tariff, section 5.75, echoes this principle:

> If the entity requesting Construction Service desires Delivery Service utilizing non-standard Delivery System facilities . . . Company shall construct such facilities unless, in the reasonable judgment of Company, such construction would impair Company's facilities or facilities with which Company is interconnected, impair the

---

[16] "Aesthetically less obtrusive" and "increased property values" were two of three "pros" that John Baumgartner, Allen's city engineer, offered to support the use of underground utility facilities. His presentation to the Allen city council about the "pros and cons" of underground utility facilities also listed "protection from wind and ice-related weather" as a third benefit. The five "cons" that Baumgartner identified were: "significantly more expensive to install," "more difficult to repair," "insufficient room in the rights-of-way to locate all providers easily," "subject to damage from other construction," and "difficult to locate horizontally and vertically."

proper operation of such facilities, impair service to retail customers, or there are other appropriate concerns that the entity requesting service is unable or unwilling to correct. The entity requesting Construction Service shall pay to Company the estimated cost of all non-standard facilities, offset by any applicable allowance.

*See* 16 Tex. Admin. Code § 25.214(d). Similar provisions appear in Centerpoint Energy, Inc.'s tariff.

Overhead distribution facilities are Oncor's standard extension of service to a customer, according to one Oncor senior electrical engineer, Rudy D. Garza, because overhead facilities provide service at the lowest reasonable cost, in accordance with Oncor's tariff, section 6.1.2.2.1. Garza testified that placing facilities underground is considered non-standard installation for which an up-front contribution in aid of construction is required, per section 6.1.2.2.6. He observed that

it is important to provide for equitable treatment among all customers throughout Oncor's service area. By defining overhead service as standard, Oncor prevents a customer in one area of the system with overhead facilities, from helping to pay for the underground installation in other areas of the system. The goal is to require those who cause the Company to incur unnecessary costs to pay for those costs, rather than pass them on to the entire customer base in the future. Basic cost causation principles call for this methodology so that subsidization between customer classes is minimized.

To recoup the additional expense imposed by Allen's ordinances, Oncor would have to shift the extra cost to its customers in the next rate case. Meanwhile, Oncor would bear all costs that were not contemplated when its tariff rates were set. When the new rate takes effect, all customers in Oncor's service area will have to pay the price of compliance with the ordinances, but only Allen's citizens will realize any benefit for the extra charge.

18

Although the Cities propose that Oncor collect the ordinances' extra costs through rate increases restricted to Allen's residents ("geographic ratemaking"), the ordinances still regulate electric utility rates by altering the terms of Oncor's tariff.[17] Moreover, the Texas Supreme Court recognized "the contemporary reality that the assets of an integrated utility simultaneously serve all its customers rendering the allocation of cost on a territorial basis an inappropriate method of rate-setting in the context of present-day technology." *City of Corpus Christi v. Public Util. Comm'n*, 572 S.W.2d 290, 296 (Tex. 1978). Because Allen's ordinances obliterate the portion of the tariff that held Allen financially responsible for the non-standard distribution facilities that were installed at its request, Allen is regulating Oncor's tariff rates, and the Commission has jurisdiction to review the ordinances.

**The Ordinances Regulate Oncor's "Rates," "Operations" and "Services" as Defined by PURA**

The Commission has appellate jurisdiction over Allen's ordinances because they regulate Oncor's rates, operations, and services, as those terms are defined by PURA. According to PURA, a "rate"

> includes a compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by an electric utility for a service, product, or commodity described in the definition of electric utility in

---

[17] Rudy Garza testified that geographic ratemaking is disfavored because it can increase rates and stifle competition. He explained that use of systemwide rates benefits competition by standardizing the rates for a service area, thereby minimizing the barriers to market entry for new retail electric providers. Matthew A. Troxle, a senior retail market analyst in the Commission's electric division, agreed that increased rates harm competition by reducing or eliminating the potential electric competitors' margin to undercut the regulated price-to-beat rate. *See* Tex. Util. Code Ann. § 39.202(a) (West Supp. 2004-05).

19

> this section and a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification that must be approved by a regulatory authority.

Tex. Util. Code Ann. § 31.002(15) (West Supp. 2004-05).

Allen's ordinances regulate the compensation that Oncor would typically collect from Allen for non-standard facilities by reducing Oncor's receivable amount to zero. Oncor would otherwise receive prepayment of the "total estimated cost of all non-standard facilities." The ordinances also regulate rates because they change the terms of Oncor's tariff—mandating non-standard distribution facilities, free of charge to Allen—without the Commission's approval.

PURA also defines "service," which

> has its broadest and most inclusive meaning. The term includes any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, other public utilities, an electric cooperative, and the public. The term also includes the interchange of facilities between two or more public utilities. The term does not include the printing, distribution, or sale of advertising in a telephone directory.

*Id*. § 11.003(19) (West Supp. 2004-05). By directing line placement, pole type, and screening of electric facilities (such as meters), Allen's ordinances regulate Oncor's work performance and materials. Thus, Allen's ordinances regulate Oncor's service to its customers.

While PURA does not define "operations," it has been observed that "[t]he jurisdiction of the commission extends not only to rates . . .but to every aspect of an electric utility's operation." Robert A. Webb, *The 1975 Texas Public Utility Regulatory Act: Revolution or Reaffirmation?*, 13 Hous. L. Rev. 1, 14 (1975). Ordinances such as Allen's—which direct the location of electric facility installation, specify the devices used for utility pole upgrades, and carve

20

payment exemptions out of the tariff—control Oncor's work and constitute exercises of municipal jurisdiction over a utility's operations. By PURA's definition, the Commission has appellate jurisdiction to review these types of municipal ordinances.

**Allen's Ordinances Conflict with PURA's Comprehensive Regulatory Scheme**

Another basis for the Commission's jurisdiction is that the ordinances' utility regulations conflict with PURA's comprehensive regulatory scheme. Prior to PURA's enactment in 1975, each individual city could regulate the utilities within its boundaries. PURA altered that piecemeal oversight by providing a comprehensive regulatory system for utilities. Tex. Util. Code § 11.002(a) (West Supp. 2004-05) ("The purpose of this title [PURA] is to establish a comprehensive and adequate regulatory system for public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities."). Empowering the Commission with jurisdiction to review certain municipal orders furthers the goal of regulatory uniformity. Dan Pleitz, *et al.*, *Municipalities and the Public Utility Regulatory Act*, 28 Baylor L. Rev. 977, 978 (1976).

A recent ruling from the Texas Supreme Court illustrates PURA's broad scope. *See In re Entergy*, 142 S.W.3d at 323. *In re Entergy* concerned a dispute over settlement proceeds from a utility merger. *Id.* at 319. Two corporate utilities agreed that savings realized from their merger would be incorporated into three post-merger rate proceedings before the Commission, to benefit their customers. *Id.* The agreement was placed in a Commission order. *Id.* With the advent of deregulation, and while the second rate case was pending, the Commission staff and the corporations entered into a settlement that postponed retail competition in their service area. *Id.* at 320. A group

21

of ratepayers sued the corporations for breach of contract in district court.  *Id.*  The corporations moved to dismiss, asserting that the district court lacked jurisdiction over the suit because of the Commission's exclusive jurisdiction under PURA.  *Id.* at 321-22.  The ratepayers responded that they were not directly challenging a Commission order and that the Commission lacked jurisdiction to settle a dispute over a private contract.  *Id.* at 323.  Finding that the Commission had exclusive jurisdiction, the court stated:

> [T]he statutory definition of PURA as "comprehensive" demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas.  That is, PURA is intended to serve as a "pervasive regulatory scheme" of the kind contemplated in *David McDavid Nissan.*

*Id.* (citing *Subaru v. David McDavid Nissan, Inc*. 84 S.W.3d 212, 221 (Tex. 2002)).

The Cities argue that the Commission's authority did not allow it to impair Allen's home rule and police power authority by voiding Allen's zoning development standards.  The Cities generally cite this Court's decision in *Sexton v. Mount Olivet Cemetery Association* to support the proposition that the Commission may not assert a new and additional power, regardless of whether the new power is viewed as being expedient for administrative purposes.  *See Sexton*, 720 S.W.2d 129, 137-38 (Tex. App.—Austin 1986, writ ref'd n.r.e.).

But the Commission's appellate review of ordinances that regulate an electric utility's rates, operations, and services, is not a "new" or "additional" power—it is an enumerated power in section 32.001(b) of the utility code.  *See* Tex. Util. Code Ann. § 32.001(b) (West 1998).

22

Significantly, the Cities omit the language immediately preceding their cited excerpt, which states that an agency generally has all power necessary to fulfill its specifically delegated duties:

> It is axiomatic that such agencies are creatures of statute and have no inherent authority. They may, therefore, exercise only those specific powers conferred upon them by law in clear and express language, and no additional authority will be implied by judicial construction. However, with respect to a power specifically granted the agency, the full extent of that power must be ascertained with due regard for the rule that the Legislature generally intends that an agency should have by implication such authority as may be necessary to carry out the specific power delegated, in order that the statutory purpose might be achieved. Moreover, the Legislature impliedly intends, as a general rule, that an agency should have whatever power is necessary to fulfill a function or perform a duty placed expressly in the agency by the Legislature. The Legislature does not intend that agency functions be an exercise in futility.

*Sexton*, 720 S.W.2d at 137. Allen's power to legislate for its own benefit is limited by the Commission's regulatory authority under PURA, which is itself an exercise of police power in the interest of all Texas citizens. *See City of Corpus Christi,* 51 S.W.3d at 241 & n.33 ("The United States Supreme Court has said that 'the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.'") (quoting *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983); *Munn v. Illinois*, 94 U.S.113, 125 (1877)).

One commentator has concluded that there is no power in the municipality to supervise and regulate utilities where the purpose of the state law creating the commission is to establish a complete and uniform system throughout the state for the supervision and regulation of public utility rates and service. *See* 12 Eugene McQuillin, Municipal Corporations § 34.146 (3d ed. 1995). A municipality may, under its police power, prescribe reasonable regulations as a protection

23

to the health, life, and safety of its inhabitants, even as applied to public service corporations, *but these regulations are incident to the state's sovereign police power, and must be so restricted. Id.* (emphasis added). Under the guise of a police regulation the municipality cannot undertake to prescribe service, rates, or charges containing inequalities, unjust discriminations, undue preference or advantages, contrary to the state law and free from state investigation or regulation by the state commission. *Id.* Allen's ordinances cannot be reconciled with PURA's comprehensive regulatory function.

Other states have found their utility commission's jurisdiction broad enough to address the reasonableness and equity issues that arise when a municipality makes a policy decision to require underground relocation of utilities. *See*, *e.g.*, *Homer Elec. Ass'n, Inc. v. City of Kenai*, 816 P.2d 182, 187 (Alaska 1991) (commission had jurisdiction to decide reasonableness of conditions imposed on utilities' permit to use municipal rights-of-way; commission previously found it was unreasonable for city to direct unreimbursed relocations of utilities laid in municipal rights-of-way); *City of Anaheim v. Pacific Bell Tel. Co.*, 14 Cal. Rptr. 3d 725, 729-30 (Cal. Ct. App. 4th Dist. 2004), pet. denied, 2004 Cal. LEXIS 9685 (Cal. Oct. 13, 2004) (commission had exclusive jurisdiction to decide whether city's undergrounding ordinance interfered with commission's utility regulation, and to address the equitable statewide issue about the order in which communities throughout California should have their overhead facilities moved underground); *Glen View Dev. Co. v. Public Serv. Elec. & Gas Co.*, 271 A.2d 903, 904 (N.J. 1970) (commission had jurisdiction to decide who pays for cost of undergrounding utilities when an ordinance mandates such relocation; state statutes requiring municipal consent for use of its streets by utilities did not authorize local government to legislate upon subject of who should be responsible for payment).

Courts that have ruled in favor of the municipalities had distinct legal grounds for upholding the ordinances. For example, a Minnesota court affirmed a municipal ordinance mandating underground utility lines based on a Minnesota statute that specifically authorized cities to direct utility line placement. *See Northern States Power Co. v. City of Oakdale*, 588 N.W.2d 534, 538-39 (Minn. Ct. App. 1998). No such statute exists in Texas to support Allen's ordinances. In Colorado, a court found that a municipal ordinance's conflict with a utility's tariff would not prevent a city from requiring the utilities to place lines underground, since the tariff did not rise to the level of a statute. *See U. S. W. Communications, Inc. v. Longmont*, 948 P.2d 509, 517 (Colo. 1997). In this case, Allen's ordinances conflict with PURA, as well as Oncor's tariff. *See*, *e.g.*, Tex. Util. Code Ann. § 33.004(b) (West 1998).

Although these out-of-state cases parallel certain concerns in this appeal, the Commission's decision in *Trophy Club* bears the strongest resemblance to the present jurisdictional question. *See* 1986 Tex. P.U.C. LEXIS 292, at *21, *64, *67.

**Commission had Appellate Jurisdiction over Similar Ordinances in *Trophy Club***

In *Trophy Club*, the Commission found it had jurisdiction over ordinances similar to the four at issue. *See id*. The Texas Utilities Electric Company sought Commission approval to rebuild, aboveground, a distribution feeder line that ran through the towns of Trophy Club and Westlake. *Id.* at *14. Trophy Club wanted the utility line placed underground, but declined to pay for the cost difference between underground and overhead construction, based on this ordinance:

> After the effective date of this ordinance, no electric or communication utility, whether privately or publicly owned, shall install or reconstruct, or cause to be installed or reconstructed, any overhead electric or communication transmission or

distribution facility within the corporate limits of the Town of Trophy Club unless a showing is made before the Town Council and a finding made by the Town Council that undergrounding such facility would not be feasible or would be inconsistent with sound environmental planning.

Id. at *20-21, 28. However, Texas Utilities' tariff specified that

[u]nderground service is provided to a Customer who meets Company requirements set out herein and pays to Company an amount based on the cost difference between overhead and underground service as estimated by Company.

*Id*. at *27-28. On administrative appeal, Trophy Club argued that the Commission lacked jurisdiction because the ordinance was enacted in accordance with the municipality's police power, while the Texas Utilities Electric Company and Brazos Electric Power Cooperative, Inc. asserted that PURA authorized the Commission's appellate review. *Id*. at *19-20.

Agreeing with the electricity providers, the hearing examiner asked to the Commission to consider

how very unlikely it is that the Legislature would create this agency to administer a "comprehensive regulatory system" over "utility rates, operations, and services," PURA section 2, but deny it the authority to review municipal ordinances such as these, which drastically affect such operations and services. The examiner cannot believe that the Legislature intended substantive municipal regulation of utility services and operations to be unfettered by Commission appellate review.

*Id*. at *24. He invited the Commission to reflect upon the consequences, if municipalities had the authority to issue ordinances such as these:

If utilities were not notified of the ordinances or for some other reason failed to appeal to the Commission, the "comprehensive regulatory system" of PURA Section 2 would be transformed into a patchwork of conflicting state and municipal

26

regulations and requirements. Utilities' ability to construct facilities and to provide continuous and adequate service would depend upon the judgment of local officials rather than that of the Commission. That result is not what the Legislature intended when it vested jurisdiction over public utilities in this agency.

*Id*. at *33. The examiner also cited the Commission's 1981 order in *Magic Valley Electric Cooperative*, which rejected the theory that ordinances passed pursuant to a city's police powers are beyond the Commission's appellate jurisdiction. *Id*. at *21 (citing *Petition of Magic Valley Electric Cooperative, Inc. and Central Power and Light Company for Review of an Ordinance Passed by City of Brownsville*, Docket Nos. 2864, 2882; 1981 Tex. P.U.C. LEXIS 332, at *17) (invalidating a Brownsville ordinance that conflicted with a Commission rule and PURA by requiring public utilities to file maps with the city, at least seven days before beginning construction, showing the location of proposed utility facilities)). The examiner concluded that the Commission had jurisdiction, under PURA, to consider the appeal of Trophy Club's ordinance.

The Commission adopted the examiner's report, finding that the Trophy Club ordinance affected the operations and services rendered by electric companies within municipal limits, regardless of whether the ordinance was enacted pursuant to the town's police powers. Thus, the Commission had jurisdiction to hear an appeal of the Trophy Club ordinance. *Id*. at *21, *67-68.

As in *Trophy Club*, the Commission had appellate jurisdiction in this case based on the ordinances' conflict between municipal and state utility regulations. The Cities have not shown that Oncor may comply with its tariff, PURA, and Commission rules without simultaneously violating the ordinances in Allen's land development code.

**CONCLUSION**

The Cities' sole point of error challenges the Commission's jurisdiction to review ordinances in Allen's land development code that Allen claims to have enacted based on its police power. We find that the Commission had appellate jurisdiction to review Allen's ordinances under section 32.001(b). *See* Tex. Util. Code Ann. § 32.001(b) (West 1998). Requiring Oncor to place utility distribution lines underground, replace wooden poles with metal or concrete poles, and screen utility facilities—without charging Allen—constitutes municipal regulation of Oncor's "rates," "operations," and "services," within the definitions of the Public Utilities Regulatory Act. Accordingly, we affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: March 17, 2005