

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00237-CV

----------

ONCOR ELECTRIC DELIVERY          APPELLANT AND APPELLEE
COMPANY LLC

V.

GIOVANNI HOMES CORPORATION        APPELLEE AND APPELLANT

----------

### FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. Introduction

In three issues, appellant Oncor Electric Delivery Company LLC appeals the trial court's judgment on the jury verdict for appellee Giovanni Homes Corporation on Giovanni Homes's breach-of-contract claim and award of attorneys' fees and argues that Giovanni Homes's trespass claim cannot serve as an alternative basis for judgment against it. In a single issue in its cross-appeal, Giovanni Homes appeals the trial court's judgment notwithstanding the

verdict (JNOV) in favor of Oncor on the jury's award of interest payments on construction loans to Giovanni Homes.

Having encountered a jurisdictional defect in the case,[1] we do not reach the merits of these issues. We reverse the trial court's judgment and remand this case to the trial court with instructions to abate the case to allow Giovanni Homes a reasonable opportunity to cure the jurisdictional defect if possible. *See Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 805 (Tex. 2001) (stating that the court may abate proceedings to allow a reasonable opportunity to cure a jurisdictional impediment if the impediment is one that can be cured).

## II. Factual and Procedural Background

Giovanni Homes had to work with Oncor[2] to obtain electricity for some parcels of real property that it was developing in Fort Worth. Giovanni Homes wanted to secure a new single-phase electrical line to serve the development; after discovering a three-phase electrical line on its property on April 27, 2007, it

---

[1]The parties filed supplemental briefs regarding the jurisdictional issue in response to the court's request for additional briefing, and the court heard supplemental oral argument on the issue on February 11, 2014.

[2]As recognized by the supreme court, Oncor "owns and operates the largest electric distribution and transmission system in Texas, delivering power over some 117,000 miles of lines to about three million homes and businesses." *Oncor Elec. Delivery Co. v. Dallas Area Rapid Transit*, 369 S.W.3d 845, 847 (Tex. 2012).

also wanted to relocate that line and transformer box from its property.[3] The single-phase line was not installed until June 2008, and the three-phase line was not relocated until February 2009. Ultimately, the parties went to trial in December 2010 on Giovanni Homes's claims arising from the parties' interactions in 2007 and 2008.[4]

Giovanni Homes's breach-of-contract theory was based primarily on Plaintiff's Exhibit 80, a July 23, 2007 letter from Richard Hildebrand, an Oncor employee, to a Giovanni Homes secretary, which states,

> Oncor Electric Delivery intends to reroute the existing underground primary cable currently installed through the lot in question into a new easement along the private drive to be provided by Giovanni Homes. The relocation will reconnect the existing service necessary to provide service to the existing customers along with serving the new proposed development.

Vincent Piras, Giovanni Homes's owner, testified that in exchange for the lines' installation and relocation, Giovanni Homes was to obtain the easements across neighboring properties for Oncor and that he had obtained all of those easements and delivered them to Oncor by December 6, 2007.

The trial court submitted Question No. 1 to the jury:

---

[3]Neither party disputes that the line was located outside of the platted utility easement at the direction of a previous owner or that it supplied electricity to an adjacent landowner.

[4]In 2008, Giovanni Homes sued Oncor for trespass, negligence, and conspiracy; it added a breach-of-contract claim against Oncor in 2010. Prior to the case's submission to the jury, the other parties involved in the case either settled or were severed from it, and Giovanni Homes's only remaining claims against Oncor at trial were for trespass and breach of contract.

Did Giovanni Homes and Oncor agree on July 23, 2007 that:

a.      Oncor would relocate the three-phase underground primary cable from the Residential Lots and the Commercial Lot to a new easement?

b.      Oncor would supply electrical power via single-phase line to the Townhome Lots, Residential Lots, and Commercial Lot?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing.    You may not consider the parties' unexpressed thoughts or intentions.

Answer "Yes" or "No" for each:

a.      Relocate the three-phase line:

b.      Supply electrical power via single-phase line:

The jury unanimously answered "Yes" to both 1.a. and 1.b. and concluded in a 10–2 vote that Oncor had breached the agreement by failing to timely comply with it.   The jury also unanimously concluded that Oncor had trespassed on Giovanni Homes's commercial lot, through which the three-phase line ran.

The jury awarded to Giovanni Homes over a million dollars in damages on the contract claim, including $189,611 for construction loan interest payments, and attorneys' fees.  It awarded to Giovanni Homes $60,000 in damages on the trespass claim.  Giovanni Homes elected to recover under its breach-of-contract theory, and Oncor sought a JNOV.

The trial court entered judgment in favor of Giovanni Homes except for recovery of the construction loan interest payments and awarded to Giovanni

4

Homes $949,061 under its breach-of-contract theory, as well as prejudgment and postjudgment interest, attorneys' fees, and costs; it denied Oncor's JNOV motion except as to the construction loan interest payments. This appeal and cross-appeal followed.

### III. Jurisdiction

In the initial briefing in this case, Oncor argued, among other things, that its tariff (the Tariff), which Giovanni Homes offered into evidence and which the trial court admitted, required Giovanni Homes to provide easements to Oncor and that those easements therefore could not be consideration to support the alleged agreement between the parties. Oncor further argued that the law "forbade Oncor from changing or ignoring the terms of the Tariff."

Upon examining the Tariff and the utilities code, we discovered a potential jurisdictional issue requiring supplemental briefing and requested that each party file a brief to (1) address whether the Public Utility Commission of Texas (the PUC)[5] had exclusive jurisdiction over Giovanni Homes's breach-of-contract claim

---

[5]Although our reference was to the PUC, the Public Utility Regulatory Act (PURA) specifically provides that the PUC has exclusive original jurisdiction over the rates, operations, and services of an electric utility in (1) areas outside a municipality; and (2) areas inside a municipality that surrenders its jurisdiction to the commission under section 33.002. *See* Tex. Util. Code Ann. § 32.001(a) (West 2007). However, when a municipality has not surrendered its jurisdiction to the PUC, the municipality has exclusive original jurisdiction over the rates, operations, and services of an electric utility, and the PUC then has exclusive appellate jurisdiction to review the municipality's order. *Id.* §§ 32.001(b), 32.002, 33.001(a) (West 2007). Therefore, our references here to the PUC encompass the municipality (City of Fort Worth) to the extent that it has not surrendered its jurisdiction to the PUC. *See id.* § 32.004 (West 2007) (stating that upon a

5

and (2) explain the role of the Tariff and the filed-rate doctrine in light of the 1999 deregulation amendments to the Public Utility Regulatory Act. *See City of Allen v. Pub. Util. Comm'n of Tex.*, 161 S.W.3d 195, 199 (Tex. App.—Austin 2005, no pet.) (stating that the question of jurisdiction is fundamental and can be raised at any time in the trial of a case or on appeal).

In its supplemental briefing, Oncor argued that the breach-of-contract claim directly related to Oncor's provision of "Delivery Services" covered by the Tariff and that the PURA placed exclusive original jurisdiction over issues covered by the Tariff in the pertinent regulatory authorities, while Giovanni Homes countered that the contract was "a private, non-administrative, non-regulatory agreement that does not fall within the PURA's stated purpose for enactment."[6] Giovanni Homes contends that the Tariff does not govern its claims and so does not trigger the PURA's exclusive jurisdiction provisions. We therefore review the PURA and the Tariff to determine whether Giovanni Homes's contract claim falls within their purview.

---

municipality's request, the PUC may advise and assist the municipality with respect to a question or proceeding arising under the PURA).

[6]Although the parties disagree about the application of the Tariff and the filed-rate doctrine, both agreed that the PUC continues to regulate Oncor even after deregulation.

## A. Exclusive Jurisdiction

An agency has exclusive jurisdiction when the legislature has granted that agency the sole authority to make an initial determination in a dispute and when a pervasive regulatory scheme indicates that the legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed. *In re Entergy Corp.*, 142 S.W.3d 316, 321–22 (Tex. 2004) (orig. proceeding). If an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking review of the agency's action. *Id.* at 321. Until the party has exhausted all administrative remedies, the trial court lacks subject matter jurisdiction and must dismiss any claim within the agency's exclusive jurisdiction. *Id.* at 321–22; *see also GuideOne Ins. Co. v. Cupps*, 207 S.W.3d 900, 904 (Tex. App.—Fort Worth 2006, pet. denied).

## B. Public Utility Regulatory Act

The utilities code governs electric, telecommunications, and gas utilities. *See* Tex. Util. Code Ann. §§ 11.004, 31.002, 51.002, 101.003, 181.001 (West 2007 & Supp. 2013). The PURA—located in utilities code title 2—contains the provisions that apply to the jurisdictional issue before us.[7] *See State v. Pub. Util.*

---

[7]Title 3 contains the Gas Utility Regulatory Act (GURA). See Tex. Util. Code Ann. §§ 101.001–124.002 (West 2007). Title 4, subtitle A, addresses cooperatives, joint power agencies, and joint ownership of electric facilities by public entities. *Id.* §§ 161.001–164.006 (West 2007). Subtitle B of title 4 contains provisions regulating delivery of services, including the condemnation power; the authority to own, hold, or use land, a right-of-way, an easement, a franchise, or a building or other structure as necessary; the power to generate, transport, and sell electric current, to impose reasonable charges, and to

*Comm'n of Tex.*, 883 S.W.2d 190, 196 (Tex. 1994) (stating that in ascertaining the scope of the PUC's authority, "we must read PURA as a whole to ascertain the underlying legislative intent"). Within title 2, chapters 11, 14, and 17 of the general PURA provisions[8] and chapters 31, 32, 33, and 38 of the specific PURA provisions applicable to electric utilities are pertinent to our discussion.[9] *See*

construct, maintain, and operate power plants, substations, and other machinery as necessary to operate lines. *See id.* §§ 181.004, .007–.008 (West 2007).

Within title 4, sections 181.041 through 181.047 specifically apply to electric utilities but do not affect our discussion on the facts of this case. *Id.* §§ 181.041–.047 (West 2007 & Supp. 2013). For example, under section 181.046(b), the Texas Transportation Commission or a county commissioners court may require an electric utility to relocate a line at the utility's own expense to allow for widening of a right-of-way, changing a traffic lane, improving a road bed, or improving a drainage ditch located on a right-of-way. *Id.* § 181.046(b). Various other provisions in title 4 apply to telephone and telegraph companies, meter testing, deposits, and solar energy device ratings, among other items not pertinent to the disposition of the issue before us. *Id.* §§ 181.081–185.005 (West 2007 & Supp. 2013). Title 5 addresses facility damage prevention and safety. *Id.* §§ 251.001–.203 (West 2007 & Supp. 2013).

[8]Chapter 12 pertains to the organization of the PUC, chapter 13 pertains to the office of public utility counsel, chapter 15 covers judicial review of administrative proceedings, including enforcement and penalties; and chapter 16 covers commission financing. *See* Tex. Util. Code Ann. §§ 12.001–.255, 13.001–.064, 15.001–.052, 16.001–.044 (West 2007).

[9]Chapter 34 has been repealed, chapter 35 addresses alternative energy providers, and chapter 36 pertains exclusively to rates—how they are computed, procedures for proposed rate changes, cost recovery and rate adjustment, rates for governmental entities, and securitization for recovery of system restoration costs. Tex. Util. Code Ann. §§ 35.001–.152, 36.001–.406 (West 2007 & Supp. 2013). Chapter 37 involves certificates of convenience and necessity. *Id.* §§ 37.001–.157 (West 2007 & Supp. 2013). Chapter 39 addresses deregulation and procedures that have no bearing on the breach-of-contract issue in this case. *Id.* §§ 39.001–.916 (West 2007 & Supp. 2013). Chapter 40 addresses competition for municipally owned utilities and river authorities, chapter 41

Tex. Util. Code Ann. §§ 11.001–.009, 14.001–.207, 17.001–.203, 31.001–43.152 (West 2007 & Supp. 2013).

In construing the PURA, our objective is to determine and give effect to the legislature's intent, looking at the plain and common meaning of the statute's words. *Entergy*, 142 S.W.3d at 322. When a statute's meaning is unambiguous, we interpret the statute according to its plain language. *Id.*; *see also In re Sw. Bell Tel. Co.,* 235 S.W.3d 619, 624–25 (Tex. 2007) (orig. proceeding). Further, "[i]n determining the meaning of a statute, a court must consider the entire act, its nature and object, and the consequences that would follow from each construction." *Benish v. Grottie*, 281 S.W.3d 184, 193 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex. 1991)); *see generally* Tex. Gov't Code Ann. §§ 311.001–.034 (West 2013) (setting out presumptions and matters to be considered in construing statutes).

### 1. General Provisions

The legislature enacted the PURA "to protect the public interest inherent in the rates and services of public utilities." Tex. Util. Code Ann. § 11.002(a). The PURA's purpose is "to establish a comprehensive and adequate regulatory system for public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities." *Id.* It grants to the PUC

---

involves electric cooperatives, and chapter 43 involves use of the electric delivery system for access to broadband and other enhanced services. *Id.* §§ 40.001–.104 (West 2007 & Supp. 2013), §§ 41.001–.104 (West 2007 & Supp. 2013), §§ 43.001–.152 (West 2007). There is no chapter 42.

9

the authority to make and enforce rules necessary to protect electric services for customers consistent with the public interest. *Id.* § 11.002(c).

Under the PURA, "service" has its "broadest and most inclusive meaning," which includes "any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, other public utilities, an electric cooperative, and the public." *Id.* § 11.003(19). "Rate" is likewise broadly defined to include "any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a public utility for a service, product, or commodity described in the definition of utility in Section 31.002 or 51.002," and "a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification."[10]    *Id.* § 11.003(16)(A)–(B).

---

[10]Section 31.002(15), which pertains specifically to electric utilities, contains the same definition of "rate" but adds a restrictive clause after classification:

> a compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by an electric utility for a service, product, or commodity described in the definition of electric utility in this section and a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification *that must be approved by a regulatory authority*.

Tex. Util. Code Ann. § 31.002(15) (emphasis added); *see Tex. W. Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 184–85 (Tex. 2012) ("Scrutinizing grammar in interpreting statutes, we are cognizant of the rule that '[m]odifiers should come, if possible, next to the words they modify.'") (quoting William Strunk, Jr. & E.B. White, The Elements of Style R. 30 (4th ed. 2000)). Chapter 31 does not include a separate definition for services, and neither chapter 11 nor chapter 31 defines "operations."

Further, we are directed to liberally construe the PURA to promote the effectiveness and efficiency of regulation of public utilities to the extent that this construction preserves the validity of the PURA and its provisions. *Id.* § 11.008. Government code chapter 2001 (the Administrative Procedure Act) applies to a proceeding under the PURA "except to the extent inconsistent with this title." *Id.* § 11.007(a).

The PURA provides that public agencies regulate utility rates, operations, and services as a substitute for competition, *id.* § 11.002(b), and the PUC "exercises the jurisdiction and powers conferred" by the PURA. *Id.* § 12.001. Despite the 1999 deregulation amendments, the PUC is still charged with regulating utilities as required to facilitate competition, free market operation, and customer choice. *Compare Oncor Elec. Delivery Co. v. Pub. Util. Comm'n of Tex.*, 406 S.W.3d 253, 256 (Tex. App.—Austin 2013, no pet.) (noting that Oncor, as a regulated electric utility company, applies to the PUC for authorization to change its system-wide rates), *Nucor Steel-Tex. v. Pub. Util. Comm'n of Tex.*, 363 S.W.3d 871, 873 (Tex. App.—Austin 2012, no pet.) (stating that under the PURA, the PUC was required to analyze whether the acquisition of a regulated utility is in the public interest), *and Sw. Elec. Power Co. v. Pub. Util. Comm'n*, 419 S.W.3d 414, 423(Tex. App.—Amarillo 2011, pet. denied) (quoting section 25.1 of the administrative code pertaining to PUC's purpose), *with Double Diamond, Inc. v. Hilco Elec. Co-op., Inc.*, 127 S.W.3d 260, 263 & n.6 (Tex. App.—Waco 2003, no pet.) (stating that on September 1, 1999, the Hilco electric

11

cooperative ceased to be regulated by the PUC), *subseq. disp.*, 195 S.W.3d 336 (Tex. App.—Waco 2006, pet. denied).

The PUC "has the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by [the PURA] that is necessary and convenient to the exercise of that power and jurisdiction." Tex. Util. Code Ann. § 14.001. The PUC may also decide a dispute involving a private agreement that directly affects the public interest. *Pub. Util. Comm'n of Tex. v. Sw. Bell Tel. Co.*, 960 S.W.2d 116, 122–23 (Tex. App.—Austin 1997, no writ) (op. on reh'g) (stating that attorneys' fee agreement was more than a private agreement because it directly affected the public interest). Under the PURA, the PUC and individual municipalities share jurisdiction over the regulation of utilities, including the establishment and regulation of utility rates. *Oncor Elec.*, 406 S.W.3d at 256 & n.3 (citing Tex. Util. Code Ann. §§ 32.001(a)–(b), 33.001–.002).

Further, chapter 17 of the PURA specifically covers "Customer Protection," the purpose of which is to establish retail customer protection standards and confer on the PUC "authority to adopt and enforce rules to protect retail customers from fraudulent, unfair, misleading, deceptive, or anticompetitive practices." Tex. Util. Code Ann. § 17.001(b). Section 17.004 states that all buyers of retail electric services are entitled to "impartial and prompt resolution of disputes with . . . an electric utility," and that the PUC may adopt and enforce rules as necessary and appropriate to carry out customer protection standards.

*Id.* § 17.004(a)(5), (b). Section 17.157 provides that the PUC may resolve disputes between a retail customer and an electric utility. *Id.* § 17.157(a). It may also order the utility to produce information or records, require that all contracts display a working toll-free number that customers can call with complaints and inquiries, require a utility to refund or credit overcharges or unauthorized charges with interest if it has failed to comply with PUC rules or a contract with the customer, and "investigate an alleged violation." *Id.* § 17.157. Section 17.157(c) requires the PUC to adopt procedures to resolve disputes in a timely manner, not to exceed sixty days. *Id.* § 17.157(c). As noted by the supreme court,

> The PUC has broad regulatory authority to ensure utilities provide safe, adequate, efficient, and reasonable service. Several PUC regulations provide remedies to consumers and penalize utilities for unsafe or inadequate service. For example, the PUC may institute a formal investigation against a utility on its own initiative or upon a customer's complaint. A customer may complain to the PUC about an electric utility's acts or omissions that violate the PURA or PUC regulations. The PUC resolves these complaints either through an informal proceeding or through a formal complaint process.
>
> The PUC also imposes administrative penalties on utilities that do not provide safe, adequate, reasonable, and efficient service to customers. These penalties can include lowering a utility's reasonable return on investment capital, adopting minimum performance target levels the utility must meet, adopting customer-service performance benchmarks, requiring quality assurance through independent audits and consultants, and requiring the utility to provide notice to customers about a utility's service quality requirements.

*Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 221 (Tex. 2002) (internal citations omitted.)

13

## 2. Specific Provisions

The PUC has exclusive original jurisdiction over the rates, operations, and services of an electric utility in areas outside a municipality and areas inside a municipality that surrenders its jurisdiction to the PUC. Tex. Util. Code Ann. § 32.001(a); *Ellis v. Reliant Energy Retail Servs., L.L.C.*, 418 S.W.3d 235, 244 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (stating that "the plain language of sections 31.001 and 32.001 clearly expresses the Legislature's intent that PURA be the exclusive means of regulating, and the PUC exercise exclusive jurisdiction with regard to, *electric utilities*"); *City of Hous. v. Centerpoint Energy Hous. Elec., LLC*, No. 01-11-00885-CV, 2012 WL 6644982, at *4 (Tex. App.—Houston [1st Dist.] Dec. 20, 2012, no pet.) (mem. op.) ("PURA sections 32.001 and 33.001 expressly grant 'exclusive original jurisdiction' over the *rates* and *services* of an electric utility to the governing body of the municipality or to the Public Utilities Commission, if a municipality's jurisdiction is not implicated."); *see also Hyde v. Ray*, 181 S.W.3d 835, 841, 843 (Tex. App.—Fort Worth 2005, no pet.) (interpreting temporary injunction order directly related to water service as invading the TCEQ's exclusive jurisdiction under water code section 13.042(e)); *Meekey v. Rick's Cabaret Int'l, Inc.*, 171 S.W.3d 394, 398–99 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (op. on reh'g) (stating that examples of statutory language conferring exclusive jurisdiction are found in section 32.001 of the PURA; article 4413(36), section 3.01(a) of the Texas Revised Civil Statutes; tax code section 111.104(b–f); and in the water code).

The legislature enacted chapters 31 through 43 of the PURA "to protect the public interest inherent in the rates and services of electric utilities" and "to establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." Tex. Util. Code Ann. § 31.001(a). Except as otherwise provided by the PURA, "[p]ublic agencies regulate electric utility rates, operations, and services." *Id.* § 31.001(b); *see Entergy*, 142 S.W.3d at 323 (stating that the PURA's statutory description as "comprehensive" showed the legislature's belief that it "would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas").

Under section 32.101, an electric utility shall file with the PUC a tariff showing each rate that is subject to the PUC's original or appellate jurisdiction and in effect for a utility service, product, or commodity offered by the utility. Tex. Util. Code Ann. § 32.101(a). As part of the tariff, it shall also file each rule that relates to or affects a rate of the utility or a utility service, product, or commodity furnished by it. *Id.* § 32.101(b). Accordingly, under the utilities code, the provision of *any* service by Oncor is governed by its tariff. *See id.* § 32.101. The tariff is filed with and approved by the PUC, which adopts "just and reasonable standards, classifications, rules, or practices an electric utility must follow in furnishing a service." *Id.* § 38.002(1); *see also CenterPoint Energy Hous.*, 2012 WL 6644982, at *1 (observing that a tariff governs the terms and conditions of services provided by an electric utility).

15

Maintaining the uniformity of rates and services is essential to the PURA's regulatory scheme. *See* Tex. Util. Code Ann. § 36.002 (stating that an electric utility may not charge or receive a rate for utility service except as provided by this title); § 36.004(a) (stating that an electric utility may not directly or indirectly charge, demand, or receive from a person a greater or lesser compensation for a service provided or to be provided by the utility than the compensation prescribed by the applicable tariff filed under section 32.101). And under section 38.002, the regulatory authority, on its own motion or on complaint and after reasonable notice and hearing, may adopt just and reasonable standards, classifications, rules, or practices an electric utility must follow in furnishing a service.[11] *Id.* § 38.002(1); *see also id.* § 38.021 (stating that in providing a service to persons in a classification, an electric utility may not either grant an unreasonable preference or advantage or subject a person to an unreasonable prejudice or disadvantage).

### 3.  The PUC's Administrative Rules

Administrative rules have the same force as statutes and are generally construed in the same way. *See Ellis*, 418 S.W.3d at 248. The PUC's rules state that its mission is "to assure the availability of safe, reliable, high quality services that meet the needs of all Texans at just and reasonable rates" by

---

[11]Chapter 38 provides for the regulation of electric services in terms of safety, adequacy, and efficiency of service. Tex. Util. Code Ann. §§ 38.001–.101.

establishing a comprehensive system with respect to electric service and "to establish the rights and responsibilities of the electric utilities . . . and electric customers." 16 Tex. Admin. Code § 25.1 (2003) (Pub. Util. Comm'n, Purpose and Scope of Rules). The PUC's rules set out time limits for items such as requests for construction of line extensions.[12] *Id.* § 25.22(3) (1999) (Pub. Util. Comm'n, Request for Service). Under the rules, a customer may file a complaint in person, by letter, or by telephone with the electric utility, which "shall promptly investigate and advise the complainant of the results within 21 days." *Id.* § 25.30(a) (1999) (Pub. Util. Comm'n, Complaints). The customer has the right to request a supervisory review if unsatisfied with the electric utility's response to the complaint. *Id.* § 25.30(b). The results of the supervisory review must be provided in writing to the customer within ten days of the review, and customers who are dissatisfied with the supervisory review must be informed of their right to file a complaint with the PUC. *Id.* § 25.30 (b)(3), (4), (c).

---

[12]The PUC's time limit for completing requests for new residential service such as line extensions is within ninety days or within a time period agreed to by the customer and the utility if the applicant has met credit requirements, made satisfactory payment arrangements for construction charges, and complied with all applicable state and municipal regulations. 16 Tex. Admin. Code § 25.22(3) (1999) (Pub. Util. Comm'n, Request for Service).

## 4. Oncor's Tariff

Oncor's Tariff, comprised of "Rate Schedules, Riders, and service rules and regulations," contains numerous definitions and states that it covers "any Service Agreements made pursuant to the Tariff." Therefore, if the alleged agreement between Giovanni Homes and Oncor was a "Service Agreement," then it falls under the Tariff.

The Tariff defines "Service Agreement" as "[a]ny Commission-approved agreement between Company and a Retail Customer . . . which sets forth certain information, terms, obligations and/or conditions of Delivery Service pursuant to the provisions of this Tariff." It defines "Delivery Service" as "[t]he service performed by Company pursuant to this Tariff for the Delivery of Electric Power and Energy. Delivery Service comprises Delivery System Services and Discretionary Services." "Delivery System Services" are defined as "all Tariffed Delivery Services provided by the Company that are not specifically defined as Discretionary Services," while "Discretionary Services" are defined as "Customer-specific services for which costs are recovered through separately priced Rate Schedules specified in Chapter 6." Chapter 6 of the Tariff covers "Construction Service Charges."

Under the Tariff, line installations and relocations fall under the definition of "Construction Services," as "[s]ervices related to the construction, extension, *installation*, modification, repair, upgrade, conversion, *relocation*, or *removal* of

18

Delivery System facilities,[13] including temporary facilities." [Emphasis added.] "Whenever used in the context of Construction Services, the term Retail Customer also includes *property owners, builders, developers*, contractors, governmental entities, or any other organization, entity, or individual that is not a Competitive Retailer making a request for such services to the Company." [Emphasis added.]

Section 6.1.2.2 of the Tariff applies to all retail customers requesting construction services from Oncor under section 5.7, the Tariff's "Facilities Extension Policy." The facilities extension policy covers the extension of service at a retail customer's request for the installation of standard facilities and the removal and relocation of facilities. It states that Oncor is responsible for the construction of delivery system facilities necessary to connect a retail customer to the delivery system but that payments in the form of a contribution in aid of construction or an advance for construction may be required prior to commencement of construction, in accordance with sections 5.7.4, 5.7.5, and 6.1. Further, section 5.7.2 provides that Oncor may require an executed facility extension agreement, in the form approved by the PUC and specified in section 6.3, which covers agreements and forms, before it constructs delivery system facilities. When any payments are required, Oncor "will provide a detailed cost

___

[13]The Tariff defines "Delivery System" as "[t]he electric lines, and other equipment, including transformers, owned by Company and the Meters, including Non-Company Owned Meters, used in the Delivery of Electric Power and Energy."

estimate for the entity requesting the service to determine the special contractual arrangements required before Construction Service is provided."

Section 5.7.3, "Processing of Requests for Construction of Delivery System," is particularly relevant and states,

> Requests for new residential Delivery Service requiring Construction Service, such as line extensions, shall be completed within 90 days of execution of the Facility Extension Agreement, or within a time period agreed to by the entity requesting the Construction Service and Company, and after the entity requesting Construction Service has made satisfactory payment arrangements for Construction Service Charges. For all other extensions requiring construction, request should be completed within the time estimated by Company. . . . Unless mutually agreed to by Company and Retail Customer, within ten Business Days of Company's receipt of a detailed request, Company shall give the entity requesting Construction Service an estimated completion date and an estimated cost for all charges to be assessed.
>
> Unless a delay is beyond the reasonable control of Company, a delay of more than 90 days beyond execution of the Facility Extension Agreement for new residential Delivery Service shall constitute failure to serve, unless the entity requesting the service has agreed to a longer term. *The Commission may conduct enforcement action and seek penalties and other remedies for unreasonable delays*.

[Emphasis added.] Section 5.7.8, pertaining to the removal and relocation of Oncor's facilities and meters, requires the entity requesting the removal or relocation to pay Oncor "the total cost of removing or relocating such Delivery System facilities in accordance with Chapter 6."

Section 6.1.2.2.1.4, "Space Requirements," provides that with regard to delivery system facilities,

20

Retail Customer grants to or secures for Company, at Retail Customer's expense, any rights-of-way or easements on property owned or controlled by Retail Customer that are necessary for Company to install Delivery System facilities for the purpose of delivering Electric Power and Energy to the Retail Customer. Such easement will be in a form acceptable to Company, including but not limited to, the form of easement agreements set forth in Section 6.3 of this Tariff.

*With respect to distribution facilities, Retail Customer shall provide any necessary rights-of-way on property not owned or controlled by Retail Customer. If Retail Customer is unable to secure for Company any necessary rights-of-way or easements on property not owned or controlled by Retail Customer, Retail Customer shall be responsible for the actual costs incurred by Company in obtaining and clearing such rights-of-way or easements.*

[Emphasis added.]

Chapter 6 includes another set of specific definitions, including "CONTRIBUTION IN AID OF CONSTRUCTION" (CIAC), which is a payment by the customer to Oncor "for facilities extensions, upgrades, or expansions in excess of allowable expenditures, or for nonstandard service facilities, removals or relocations." Additional fees for "Delivery System Facilities Relocation/Removal" and a study on that relocation and removal are covered by a "Discretionary Service Agreement," while a Delivery Systems Facility Installation is covered by a "Facility Extension Agreement." Section 6.3 contains the form agreements. Sections 6.3.6, 6.3.7, 6.3.8, 6.3.9, 6.3.10, and 6.3.11 contain forms entitled "Easement and Right of Way."

Under section 5.11.2, "Complaints," a retail customer "may submit written complaints about Delivery Service" to Oncor and may call Oncor to lodge oral

complaints, and Oncor "shall inform Retail Customer of its right to file a complaint with" the PUC and provide the PUC's contact information to the customer.

### 5.  Oncor's Work Request Authorizations

The parties' exhibits show the progression of the two line requests made to Oncor—one for relocation and the other for installation.

#### a.  Work Request #2812378

Work Request #2812378 corresponds to the installation of the single-phase line requested by Giovanni Homes.  Plaintiff's Exhibit 73 is the May 2006 work request authorization by TXU (Oncor's predecessor) setting out that $19,412 was authorized of the $22,233 expenditure for "provid[ing] service to a residential subdivision as requested by the developer.  It is proposed to install the necessary distribution facilities to meet the customer[']s load requirements as shown on this W[ork] R[equest] per Operational memo 2002, revised Oct. 2, 2002."  The justification of expenditure sets out the formulas to calculate the allowable expenditure, associated costs, and CIAC charges to the customer.  Plaintiff's Exhibit 77 is a February 22, 2007 CIAC Detail Report for Work Request #2812378 stating that "[i]n accordance with TXU ED's 2002 Line Extension Policy and tariffs on record with the Public Utility Commission of Texas, this extension may be provided at a total cost of $6236.24 to the Retail Customer," and explaining the CIAC calculations.  Plaintiff's Exhibit 84 is an October 18, 2007 CIAC Detail Report for Work Request #2812378, stating that

> [i]n accordance with TXU ED's 2002 Line Extension Policy and tariffs on record with the Public Utility Commission of Texas, this extension may be provided at no cost to the Retail Customer through the use of least cost design, cleared ROW, and standard facilities at a cost that does not exceed standard allowances.

Plaintiff's Exhibit 83 is a September 14, 2007 email from an Oncor representative to Giovanni Homes that states, "Construction to install facilities at Water Chase will saw cut area to install transformer and bore parking lot to install conduit to the north." Defendant's Exhibit 19 is an internal email showing Oncor's February 4, 2008 calculations for Work Request #2812378 and the subsequent April 28, 2008, May 7, 2008, and May 9, 2008 recalculations for Work Request #2812378 due to design change.

### b. Work Request #2898038

Work Request #2898038 corresponds to the relocation of the three-phase line.

Plaintiff's Exhibit 79 is a July 19, 2007 email from one of Oncor's representatives to Giovanni Homes in which the Oncor representative states, "The cable that exists on the property in question will be relocated when we complete the paperwork necessary to relocate the line as requested. Oncor Electric Delivery intends to relocate the primary cable crossing lot 3 Block 1 of The Academy At Waterchase." Plaintiff's Exhibit 80 is the July 23, 2007 letter relied upon by Giovanni Homes in support of its contract claim and set out in our factual recitation above.

Plaintiff's Exhibit 5 is the January 2008 work request authorization (Work Request #2898038) by Oncor stating that $73,843 was authorized along with the following justification: "The developer of Academy at Waterchase Subdivision has request [sic] a section of underground and a three phase transformer out of easement be relocated. This w[ork] r[equest] will cover the cost to relocate underground facilities into a new easement and clear area for development. Voucher is for travel yard/time adder." The work request authorization listed material, labor, and other items that were factored into the authorized expenditure. Plaintiff's Exhibits 87, 88, and 89 contain lists of the materials required for the activity.

Plaintiff's Exhibit 283, the easement that Giovanni Homes granted to Oncor on September 20, 2007, is in substantially the same format as the easement form in the Tariff, as is Plaintiff's Exhibit 281, the easement that K. Hovnanian Homes-DFW, LLC granted to Oncor that same day. Also in the same format are Plaintiff's Exhibit 285, the easement that Links at Waterchase LLC granted to Oncor on November 15, 2007; Plaintiff's Exhibit 284, the easement that Jim McLean Enterprises, Inc. granted to Oncor on November 19, 2007; and Plaintiff's Exhibit 282, the easement that Dorcas Benson granted to Oncor on December 6, 2007. Plaintiff's Exhibits 283, 284, and 285 are stamped "Return to: Oncor Electric Delivery Company Right of Way Department" and reference Work Request #2898038. The K. Hovnanian Homes easement also references

24

Work Request #2898038, while the Benson easement references Work Request #2812378.

### c. Giovanni Homes's Conversation with the PUC

Piras testified that when he found out that the three-phase line ran through Giovanni Homes's property, he called the PUC to find out what his rights were and discussed the fact that there was an electric line on his property for over an hour. He said that the PUC told him that it could not help him and that he had to deal with the matter civilly.[14] Piras said that when he spoke to the PUC, he asked as a hypothetical, "I have lines on my property, and this company, Oncor, won't take the lines off my property. What can I do?"

During cross-examination, the following conversation occurred:

> Q. Well, you know the Public Utility Commission is the watchdog—the governmental watchdog over the public utilities, right?
>
> A. That's what I assume, yes.
>
> Q. Okay. Have—have you ever looked and seen on the Web sites or talked to these people about the fact that you can file a complaint, the electric company has to answer within 21 days, there is an investigation done, and both parties get a result of that investigation?
> Did you find that information out?
>
> A. I was told by them directly, sir, that my only avenue I could take is taking it up civilly.

---

[14]Piras also said that he did not tell the PUC who he was when he called because he wanted to find out what the law was and what it regulated but did not want Oncor to find out and cause trouble for his company.

Q. All right. So—so you made an anonymous call. And—and you're—you're a developer. You say you have done multiple developments, hundreds and hundreds of homes.

You have dealt with all these situations, right, as far as developing property?

A. I have developed properties, yes.

Q. And you call the Public Utility Commission because you are having all these horrendous problems with Oncor, and you don't leave your name, you don't make a complaint, you don't do anything except, according to you, make a phone conversation; is that right?

A. I had a phone conversation to find out what the legalities were, and I found out that there is no governing over you, Oncor, being able to have utility lines on somebody else's property. There is nothing there.

Q. So the PUC said there is nothing that governs Oncor having lines on the property where they were?

A. On—on other people's property out of easement. There is no details of this situation anywhere.

Q. Okay. Nothing governs it, then, is your understanding?

A. Nothing governs it from my understanding of what I was told.

During the supplemental oral arguments in this case, Oncor's counsel pointed out that Piras would have called the PUC in 2007 or 2008, after discovering the three-phase line and encountering delay, but that Giovanni Homes did not add its breach-of-contract claim to its lawsuit until 2010. Until adding that breach-of-contract claim in 2010, all of Giovanni Homes's claims against Oncor—negligence, conspiracy, and trespass—had sounded in tort. *See infra* n.19.

26

## C. Analysis

Although Giovanni Homes argues that the PUC's exclusive jurisdiction does not apply to this case because the Tariff does not address the dispute at issue, based on the provisions of the PURA, the PUC's administrative regulations, and the Tariff set out above, we disagree.

The PURA sets out a comprehensive regulatory scheme, with broad and inclusive definitions of "rates" and "services" and a requirement that every rate or service provided by an electric utility be furnished and filed in a tariff. In compliance with the PURA, the PUC's administrative rules set out time limits for the kinds of services Giovanni Homes sought from Oncor and a complaint process. Oncor's Tariff is also comprehensive, and Giovanni Homes, a retail customer under the Tariff, sought relocation of one electric utility line and installation of another, both of which fall under the Tariff's definitions of "Construction Services" and "Service Agreement." The work request authorizations that correspond to Giovanni Homes's requested services follow the Tariff's requirements, as do the easements Giovanni Homes claims were consideration, which it was required to obtain under the Tariff.

When claims pertain to "services" and "rates" under the PURA, the PUC has exclusive original jurisdiction. *Compare CenterPoint Energy Hous.*, 2012 WL 6644982, at *2–3, *8 (concluding that regulatory authority had exclusive original jurisdiction over dispute concerning overcharges for street light services), *Tara Partners, Ltd., v. CenterPoint Energy Res. Corp.*, 371 S.W.3d 441, 447 (Tex.

27

App.—Houston [1st Dist.] 2012, no pet.) (holding plaintiff failed to exhaust administrative remedies in its lawsuit against gas company for overbilling), *and City of Allen*, 161 S.W.3d at 197, 212 (stating that when a city's municipal ordinance conflicts with Oncor's tariff, the PURA, or the PUC's rules, the PUC has jurisdiction under the PURA to review and invalidate the ordinance),[15] *with Jenkins v. Entergy Corp.*, 187 S.W.3d 785, 791–92, 800–01 (Tex. App.—Corpus Christi 2006, pet. denied) (concluding that the PUC did not have exclusive jurisdiction because the retail rate structure was not the object of appellant's pleadings and the suit was inherently judicial because appellant had brought state law tort claims based on interstate purchasing and allocation decisions), *cert. denied*, 552 U.S. 1224 (2008). To hold otherwise would contradict the PURA's standardization and nondiscrimination purposes and the point of having a tariff. *See* Tex. Util. Code Ann. §§ 32.101, 36.004, 38.002, 38.021. Therefore, we conclude that the PUC had exclusive jurisdiction over Giovanni Homes's contract claim.

---

[15]The supreme court "has implicitly recognized that municipalities sometimes contract with third parties by way of ordinance" and when an ordinance evidences a contract and is sought to be enforced as one, the court has construed it as any other contract. *City of Hous. v. Williams*, 353 S.W.3d 128, 136–37 (Tex. 2011). We see no reason why the PUC, which has exclusive jurisdiction to review an ordinance that might conflict with the Tariff, the PURA, or the PUC's rules, *see City of Allen*, 161 S.W.3d at 212, should not also have exclusive jurisdiction to review a contract that might do so. *See City of Hous.*, 353 S.W.3d at 136–37.

Further, although Giovanni Homes argues that the Tariff does not apply because Terry Ariail, Oncor's corporate representative, testified that the Tariff did not apply, we disagree with this interpretation of his testimony, which was less than clear. Ariail's testimony was as follows:

Q. Okay. Now, let me ask you this: Would you agree with me that when Oncor laid the line, the three-phase line, that line was laid outside of the easement?

A. Yes, ma'am.

Q. All right. And it is against Oncor's policies and procedures to lay a line such as that outside of an easement and never obtain an easement from the property owner?

A. That's not exactly correct.

Q. Why is that not correct, Mr. Ariail?

A. Well, it's against our policies and procedures not to—well, let me back up.
It is our policy to—to get an easement where we can and—and we prefer to have easements covering all of our three-phase facilities that are underground. However, not all three-phase facilities and not all underground lines get easements, and that's appropriate that they don't all get easements.

Q. Let me ask you this: If a three-phase electrical line is built outside of an easement and an easement is never obtained, that would be against Oncor's policies, would it not?

A. Yes, that would—that would not be what—that would not be our desire.

Q. It would be against Oncor's policies?

A. Against our policy in particular situations. Again, not in every situation, but, yes.

Q.  *Now, the tariff that the Public Utility Commission has in the State of Texas that Oncor has to abide by, they don't even discuss Oncor's failure to install electrical lines outside of easements, do they?*[16]

A.  Not—not—they do not.

Q.  And you have never been directly involved in a situation where an electrical line was installed outside of an easement, have you?

A.  No, I have not.

Q.  But you do know and you have heard that with Oncor, that happens several times a year?

A.  I think when I made that statement, I may have been a little glib about how often it happens, but it—it does happen on occasion.

Q.  When you say you made that statement, that's what you said in your deposition?

A.  Right.  That's—that's correct.

. . . .

Q.  All right.  *And would you agree, Mr. Ariail, that Oncor doesn't have a written policy and procedure as to how they should handle a situation where an electrical line is placed outside of an easement?*

A.  *We do not.*

Q.  Okay.  It makes common sense what Oncor should do under those situations, does it not?

A.  Yes, do the right thing.

---

[16]We infer from context that the question Giovanni Homes's counsel meant to ask was something along the lines of whether the Tariff discusses Oncor's installing electrical lines outside of easements.

Q. And the common sense approach and what Oncor has the duty to do when they have laid a line outside of an easement and it's brought to their attention is they should handle that situation as expeditiously or as quickly as possible, should they not?

A. As quickly as the conditions will allow.

Q. Absolutely. So when Oncor is notified by a customer such as Vincent Piras or Giovanni Homes, I bought some property and I just learned that there is a three-phase wire running smack-dab through my property, common sense alone and the duties of Oncor would dictate that Oncor has the responsibility to fix that problem as quickly as the circumstances will allow[17] . . . correct?

A. We're obligated to find a solution to fix it. It wouldn't necessarily be to move the line. There are several options to do that.

[Emphasis added.]

While Ariail testified that Oncor did not have a written policy and procedure to handle a situation in which an electrical line is placed outside of an easement, no one disputes that the property's previous owner instructed Oncor to place the line outside of the platted easement, and, as set out above, section 5.7.8 of the Tariff contains specific provisions to address removing and relocating lines.[18] Although Giovanni Homes argues that this provision "does not address removal and relocation of trespassing electrical lines and applies only when the customer requests removal or relocation of Oncor's facilities at the customer's expense,"

---

[17]Oncor's counsel objected to this question, but the trial court overruled it.

[18]Ariail also agreed with the following statement: "Oncor is going to do what they think they should do to service the customer but also obey your [sic] rules and regulations and the tariffs in the State of Texas."

here, Giovanni Homes, a retail customer under the Tariff, specifically requested the removal and relocation of the three-phase line, actions covered by the Tariff regardless of their location or characterization as "trespassers." *Cf. Oncor Elec.*, 369 S.W.3d at 847–48 (recounting PUC approval process to construct a new transmission line and landowner participation and negotiations regarding need for aerial easement and right-of-way); *Oncor Elec. Delivery Co. v. Schunke*, No. 04-13-00067-CV, 2013 WL 6672494, at *1 (Tex. App.—San Antonio Dec. 18, 2013, pet. filed) (mem. op.) (reviewing judgment on special commissioners' award in condemnation case involving Oncor); *Oncor Elec. Delivery Co. v. Brockriede*, Nos. 02-13-00071-CV, 02-13-00072-CV, 2013 WL 6564276, at *1 (Tex. App.—Fort Worth Dec. 12, 2013, no pet.) (mem. op.) (same); *Fuqua v. Oncor Elec. Delivery Co.*, 315 S.W.3d 552, 557–58, 561 (Tex. App.—Eastland 2010, pet. denied) (affirming in part Oncor's injunction against property owner for violating electrical easement by flying small plane under high voltage power line when landing on airstrip).[19]

---

[19]Further, as pointed out by Oncor, the cases Giovanni Homes cites to support its argument that the trial court had jurisdiction over its claim—*Fuqua* (cited above), *Wooldridge v. TXU Electric Delivery Co.*, 236 S.W.3d 484 (Tex. App.—Dallas 2007, no pet.), *Roberts v. TXU Energy Retail Co.*, 171 S.W.3d 901 (Tex. App.—Beaumont 2005, no pet.), and *Oncor Electric Delivery Co. v. Murillo*, No. 01-10-01123-CV, 2014 WL 1056471 (Tex. App.—Houston [1st Dist.] Mar. 18, 2014, no pet. h.)(op. on reh'g)—do not involve a "retail customer," Oncor's tariff, the PUC, the PURA, or a contract claim, much less a contract claim covered by Oncor's Tariff. *Wooldridge*, *Roberts*, and *Murillo* all involved tort claims. *Murillo*, 2014 WL 1056471, at *1; *Wooldridge*, 236 S.W.3d at 485, 488; *Roberts*, 171 S.W.3d at 903; *see Lynn v. Hous. Lighting & Power Co.*, 820 S.W.2d 57, 58 (Tex. App.—Houston [14th Dist.] 1991, no writ) (stating that when appellant's claims

Giovanni Homes also argues that the Tariff does not apply because its breach-of-contract claim did not involve a dispute over Oncor's regulated utility rates, pricing, or services; because its claim did not seek to enforce alleged rights that contradict the Tariff's provisions; and because it is not a suit over issues that the Tariff's terms govern. Giovanni Homes states, "Claims that do not arise out of the [T]ariff or that are not expressly governed by the [T]ariff or the PURA fall outside the PUC's exclusive jurisdiction."

However, as set out above, the alleged agreement between the parties here was governed by the Tariff's express terms, which is governed in turn by the PURA and its purpose of protecting the public interest inherent in the rates and services of electric utilities. *See CenterPoint Energy Hous.*, 2012 WL 6644982, at *7 (observing that the tariff had been filed with and approved by the PUC such that it was a natural extension of the PUC's authority for it to decide, as a regulatory matter, a dispute arising from the tariff). And contrary to Giovanni Homes's argument that no provision of the PURA or the Tariff addresses an award of damages to a customer when Oncor places its line out of an easement, a request for such damages cannot operate to vest the trial court with jurisdiction when there was none before. *See Sw. Bell Tel. Co.*, 235 S.W.3d at 625–26 (concluding that the PUC had exclusive jurisdiction to hear telephone customers'

___

were tort claims for actual and exemplary damages that did not concern rates and regulations governed by the PURA, the trial court had jurisdiction to address them); *see also Grant*, 73 S.W.3d at 219–22 (reviewing tariff's reasonableness with regard to provision limiting liability for personal injuries).

rate change dispute because of the specific grant of "exclusive original jurisdiction over the business and property of a telecommunications utility" and the comprehensive regulatory scheme set out in the utilities code).

Because we conclude that the PUC has exclusive jurisdiction over the breach-of-contract claim, Giovanni Homes had to exhaust its administrative remedies before it could sue Oncor in district court on that claim.[20]

## IV. Conclusion

Based on our conclusion above, we reverse the trial court's judgment and remand this case to the trial court with instructions to abate the case to allow Giovanni Homes a reasonable opportunity to cure the jurisdictional defect, if possible. *See Fodge*, 63 S.W.3d at 805.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL: WALKER, MCCOY, and GABRIEL, JJ.

DELIVERED: April 3, 2014

---

[20]Having concluded that the PURA and the Tariff apply, we do not reach the parties' filed-rate doctrine arguments. *See Grant*, 73 S.W.3d at 216–17 (explaining that the filed-rate doctrine is a novel aspect of cases involving utilities that precludes claims seeking to enforce contracts that contradict a filed tariff's terms); *see also In re Birch Telecom, Inc.*, No. 05-12237 (PJW), 2009 WL 1531792, at *2 (Bankr. D. Del. June 2, 2009) ("Extensive case law makes it clear that in Texas, as elsewhere, filed tariffs govern utilities' relationships with their customers, and not any contradictory provisions of contracts that may have been executed.").